Lawrence E. NUNLEY, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 31A01–0902–CR–88.

Court of Appeals of Indiana.

Nov. 16, 2009.

Matthew Jon McGovern, Evansville, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

Lawrence E. Nunley appeals his convictions of four counts of Class A felony child molesting[1] and one count of Class D felony dissemination of matter harmful to minors.[2] We conclude an interview conducted a year after the molestation lacks sufficient indicia of reliability; therefore, the videotape of the interview and the witness testimony that repeated the contents of the interview should not have been admitted. Because this was the only evidence supporting Counts 3 and 4, we reverse those convictions. However, we find no reversible error as to the remaining convictions. Therefore, we reverse in part and affirm in part.

## FACTS AND PROCEDURAL HISTORY

Nunley lived with his teenage son and his son's girlfriend, K.S. K.S. sometimes babysat six-year-old A.Y. A.Y.'s mother, T.C., testified A.Y. "loved [K.S.] to death." (Tr. at 534.) On April 13, 2007, A.Y. asked to spend the night at Nunley's residence. When T.C. dropped off A.Y., Nunley told her K.S. was on the way there. T.C. was under the impression that K.S. would be watching A.Y. According to A.Y., K.S. and her boyfriend were there for only a brief time that night.

1. Ind.Code § 35–42–4–3.

2. Ind.Code § 35–49–3–3.

Sometime during the evening, Nunley called A.Y. back to his bedroom and showed her a pornographic video. A.Y. was wearing a tee shirt and panties. He took off her panties and licked her vagina. He also made her suck on his penis.

The next day, T.C. and R.C.[3] picked up A.Y. After they had been in the car for a few minutes, A.Y. told them she and Nunley had a secret. A.Y. would not say what it was, so T.C. tried to trick her into telling by saying, "That's okay. I know what the secret is." (Id. at 537.) Then A.Y. wanted to tell them, but she did not want to say it out loud, so her parents gave her a pencil and an envelope to write on. Her note indicated she "was sucking his weenie-bob and he was licking my pee-pee." (Id. at 626.)

After reading the note, T.C. turned the vehicle around and went back to Nunley's residence. She took a bat and started hitting Nunley's motorcycle and truck so he would come outside. Nunley came to the door. T.C. yelled at him and accused him of molesting A.Y. Nunley denied her accusations.

T.C., R.C., and A.Y. then went to the Washington County Police Department to make a report. They spoke to State Trooper Kevin Bowling. Trooper Bowling first attempted to interview A.Y. alone, but that did not work well, so T.C. stayed in the room with her while A.Y. answered questions. A.Y. said Nunley made her watch a "bad movie." (Id. at 626.) Trooper Bowling asked her what she meant by that, and she said, a "naked movie." (Id.) T.C. showed him the note A.Y. had writ-

3. R.C. is A.Y.'s step-father. R.C. and T.C. were separated at the time, but they were still sharing a car and were planning to exchange possession of the car when they picked up A.Y.

ten. T.C. believed she left the note with Trooper Bowling, but Trooper Bowling had no record or recollection of what happened with the note. Trooper Bowling referred the case to the Department of Child Services.

Authorities tried to arrange a forensic interview of A.Y., but T.C. did not immediately follow through. The interview was finally conducted on April 18, 2008, a little over a year after A.Y. was molested.

Donna Lloyd Black conducted the forensic interview of A.Y. at Comfort House. A.Y.'s interview was videotaped. Comfort House has an observation room for representatives from the prosecutor's office, law enforcement, and the Department of Child Services. Black can communicate with them by two-way radio, but a child being interviewed cannot see or hear the people in the observation room. Detective William Wibbels was in the observation room during A.Y.'s interview.

Nunley was charged with four counts of Class A felony child molesting: Count 1 alleged he touched A.Y.'s vagina with his mouth, Count 2 alleged he made A.Y. put her mouth on his penis, Count 3 alleged he put his hand in A.Y.'s vagina, and Count 4 alleged he touched A.Y.'s vagina with his penis. He was also charged with one count of Class D felony dissemination of matter harmful to minors, which alleged he showed A.Y. a pornographic movie.

At the time of trial, A.Y. was eight years old. A.Y. started crying at several points during her testimony and needed multiple breaks. A.Y. stated it was hard to say what had happened and that she could only write it. The prosecutor then had her write down what happened and read it to the jury. She testified she saw Nunley's penis when he made her suck on it and he licked her "pee pee." (Tr. at 450.) A.Y. testified he forced her to do these things

by threatening to hurt her parents or call the police.

T.C. testified as to why she did not immediately bring A.Y. for a forensic interview: "I had second thoughts ... just because of the fact of putting my daughter through this. And not only that ... there's a side of you that thinks maybe if you just don't acknowledge it, that it'll go away." (*Id.* at 549.) A juror asked, "[W]hat made you continue to think about it? What, was it brought up by [A.Y.]?" (*Id.* at 569). T.C. responded, "No, it wasn't brought up by [A.Y.]. It was brought up by other people. Uhm, there were other allegations that I had heard about." (*Id.*) Nunley objected and moved for a mistrial, because T.C. had been instructed not to refer to any other allegations against him. The trial court denied the motion for mistrial because T.C. did not specify the nature of the allegations, and it instructed the jury to disregard T.C.'s answer.

The videotape was played for the jury. The video was difficult to understand in some places, but Black testified she was able to understand what A.Y. was saying to her during the interview. The prosecutor therefore asked Black to recount how A.Y. had said Nunley had touched her. Black testified A.Y. said Nunley "touched her on her pee-pee with his weenie-bob, his hand and his tongue," that he "made her put his weenie-bob in her mouth and suck it," and that he made her watch a video with naked people in it. (*Id.* at 613.) Detective Wibbels also testified concerning A.Y.'s allegations made during the interview.

Nunley testified in his own behalf. He claimed T.C. called and asked if he could watch A.Y. while she went to Corydon. He asserted T.C. did not bring any extra clothes for A.Y., and he did not think A.Y. would be spending the night. He claimed

A.Y. fell asleep on the couch soon after arriving, and then his friend, Michelle Cayton, came over to Nunley's residence to spend the night, leaving shortly before T.C. picked up A.Y.[4] Nunley claimed he was in a relationship with T.C., and when T.C. came to pick up A.Y., she asked to move in with him. He would not let her, and she was angry when she left. Although Nunley voluntarily spoke with the police, he never told them Cayton had been at his residence on the night in question.

The jury found Nunley guilty as charged.

## DISCUSSION AND DECISION

Nunley raises four arguments, which we reorder and restate as: (1) whether the trial court committed reversible error by admitting A.Y.'s hearsay statements via the videotape of her interview and the testimony of several witnesses; (2) whether the trial court abused its discretion by excluding evidence A.Y. had accused her mother's boyfriend of attacking her and then later recanted; (3) whether the prosecutor committed misconduct by stating in her closing argument that A.Y. had not been taught how to lie; and (4) whether the trial court abused its discretion by denying Nunley's motion for a mistrial after T.C. referred to other allegations against Nunley.

### 1. *Hearsay Statements*

■ Nunley argues the trial court erred by permitting T.C, R.C, and Trooper Bowling to testify about what A.Y. wrote on the envelope; by allowing the videotape of A.Y.'s interview at Comfort House to be played for the jury; and by allowing Black and Trooper Wibbels to repeat A.Y.'s alle-

gations from the interview. The admission or exclusion of evidence is entrusted to the discretion of the trial court, and we will reverse only if the trial court abuses its discretion. *Surber v. State*, 884 N.E.2d 856, 862 (Ind.Ct.App.2008), *trans. denied.* An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.*

Ind.Code § 35–37–4–6, commonly referred to as the protected persons statute, allows hearsay statements of children to be admissible at trial when certain conditions are met. The statute provides, in relevant part:

(d) A statement or videotape that:

(1) is made by a person who at the time of trial is a protected person;

(2) concerns an act that is a material element of [child molesting] that was allegedly committed against the person; and

(3) is not otherwise admissible in evidence;

is admissible in evidence in a criminal action for [child molesting] if the requirements of subsection (e) are met.

(e) A statement or videotape described in subsection (d) is admissible in evidence in a criminal action listed in subsection (a) or (b) if, after notice to the defendant of a hearing and of the defendant's right to be present, all of the following conditions are met:

(1) The court finds, in a hearing:

(A) conducted outside the presence of the jury; and

(B) attended by the protected person;

---

4. Although Nunley had spoken to police, he never reported before trial that Clayton had been at his house.

that the time, content, and circumstances of the statement or videotape provide sufficient indications of reliability.

(2) The protected person:

 (A) testifies at the trial; . . . .

Ind.Code § 35–37–4–6.

Nunley challenges the trial court's finding that the time, content, and circumstances of A.Y.'s statements provided sufficient indications of reliability.

> Considerations in making the reliability determination under Ind.Code § 35–37–4–6 include: (1) the time and circumstances of the statement, (2) whether there was significant opportunity for coaching, (3) the nature of the questioning, (4) whether there was a motive to fabricate, (5) use of age appropriate terminology, and (6) spontaneity and repetition.

*Surber,* 884 N.E.2d at 862.

### A. *The Envelope*

■ The trial court did not abuse its discretion by allowing T.C., R.C., and Trooper Bowling to testify regarding what A.Y. wrote on the envelope. A.Y. made the statement spontaneously shortly after T.C. and R.C. picked her up from Nunley's residence. She used age-appropriate terminology in the note. A.Y. liked going to Nunley's residence, where she enjoyed spending time with K.S. and playing Nintendo; there was no evidence she had a motive to fabricate her initial allegations against Nunley.

Nunley's argument focuses in large part on the conduct of the adults involved in this case subsequent to A.Y.'s initial disclosure of the molestations: that her parents did not go directly to the police, but instead confronted Nunley and damaged his property; that her mother did not cooperate with the investigation of the case for a substantial period of time; and that either her parents or the police lost the note. Nunley cites no authority for his argument that subsequent behavior by other persons renders a victim's statement unreliable, and we decline to so hold.

### B. *The Interview*

■ The statements A.Y. made in her interview at Comfort House do not bear the same indicia of reliability. The interview occurred more than a year after A.Y. first accused Nunley of licking her vagina and forcing her to suck his penis. Thus, there was a significant opportunity for coaching. Furthermore, in the interview, A.Y. made new allegations that Nunley had touched her vagina with his penis and his hand. The interview was the only time A.Y. made these allegations, and she did not testify at trial that Nunley had touched her vagina with his penis or his hand. The substantial delay between the molestation and the interview calls into doubt the reliability of the new allegations A.Y. made during the interview.

In *Carpenter v. State,* 786 N.E.2d 696 (Ind.2003), the State alleged Carpenter molested his daughter, A.C., sometime between April 1, 2000 and May 19, 2000. On May 19, 2000, A.C. told her mother that Carpenter had put his fingers in her "moo moo," a word that she used for both female and male private parts. *Id.* at 698. A videotaped interview was conducted the same day. A few days later, A.C. also told her grandfather that Carpenter had touched her "moo moo" and "it hurt real bad." *Id.* at 702. The Court held the testimony recounting A.C.'s statements to her mother and grandfather and her videotaped interview were not admissible:

> It is true that A.C. repeated the same or similar statements to her mother, to her grandfather, and on the videotape. But here there is no evidence at all as to

when the alleged molestation occurred. That is, while the evidence supports a conclusion that the mother sought both medical attention and the intervention of law enforcement after her conversation with A.C. on May 19, there is absolutely nothing of record to tie the alleged molestation to May 19 or any other date. Indeed by alleging in its charging information that the offense occurred "on or before April 1, 2000 and May 19, 2000," the State effectively concedes there was a period exceeding six weeks during which the alleged molestation could have taken place.

In *Pierce,* we expressed our concern that the videotape interview occurred several hours after the alleged molestation and after the "potentially disorienting physical examination at a doctor's office." [*Pierce v. State,* 677 N.E.2d 39, 45 (Ind.1997).] Our reason for concern was that intervening delay created the potential for an adult to plant a story or cleanse one. *Id.* The same concern attaches to the videotape interview here, and it appears that A.C.'s statements to her grandfather occurred at least a full day after her statements to her mother and her videotape interview.

*Id.* at 703–04.

*Carpenter* and *Pierce* both involved younger children who were found incompetent to testify. Some subsequent cases have permitted longer delays where the child was a competent witness. *See Mishler v. State,* 894 N.E.2d 1095, 1101 (Ind.Ct. App.2008); *M.T. v. State,* 787 N.E.2d 509, 513 (Ind.Ct.App.2003). However, neither

*Mishler* nor *M.T.* involved the substantial delay at issue here, especially *after* the victim's initial disclosure, when the opportunity for coaching arises.[5] Furthermore, while these decisions address some inconsistencies in the victims' statements, it does not appear the victims made entirely new allegations.[6]

The State cites only *Surber* in support of its argument that the statements from the interview were admissible under the Protected Person Statute. In 2006, Surber lived with his five-year-old daughter, C.S. In August 2006, C.S. spent the weekend with her grandfather, Kenneth Douglas. Douglas discovered that during the weekend, C.S. and her half-brother T.B. went into a closet, and T.B. kissed C.S.'s "private." *Id.* at 860. C.S. attempted to defend T.B. by saying, "he's only doing what Daddy does." *Id.* Douglas contacted the police, and a DCS caseworker, Elizabeth Callen, interviewed C.S. C.S. claimed, "Daddy didn't do anything wrong because he was just helping me pee." *Id.* Callen removed C.S. from Surber's care, and a taped forensic interview was conducted three days later by Detective Heather McClain. C.S. again claimed Surber was helping her pee. C.S. made additional spontaneous comments to nurse Holly Renz when she was conducting a physical examination.

Surber argued the trial court abused its discretion by admitting C.S.'s statements to Douglas, Callen, and Renz and the video of her interview. We disagreed:

---

5. In *Mishler,* the victim's first statement was within a month of the last act of molestation, and all of her statements were made within a few hours after the allegations came to light. In *M.T.,* it was unclear when the molestation occurred, but the videotaped interview occurred only two days after the molestation first came to light.

6. In *Mishler,* the victim made some statements that the incidents might have been a dream, but there was evidence her mother had disbelieved her allegations and told her she was only dreaming. In *M.T.,* the victim made inconsistent statements about when the molestations occurred.

Here, it was unclear exactly when the molestations occurred, but all of C.S.'s statements were made relatively close in time to each other. C.S.'s statements to Douglas were spontaneous, and some of her statements to Nurse Renz were spontaneous. C.S. used age-appropriate terminology and had no motive to fabricate. Moreover, the trial court found that C.S. was able to distinguish between truth and falsehood, and C.S. was five years old at the time she made the statements.

*Id.* at 863.

*Surber* is distinguishable. In *Surber*, the child made spontaneous statements that were highly indicative of lack of coaching and motive to fabricate because she thought she was defending her father and half-brother by making the statements. A.Y.'s statements during the interview were not spontaneous, and nothing about the statements themselves tends to demonstrate their reliability. Furthermore, in *Surber* the statements were made within a year of the molestation and all of the child's statements were made within a few days after she disclosed the molestation. The State cites no case in which we have found reliable a statement made so long after the victim's initial disclosure, especially when the victim's statement adds new, material allegations. Therefore, we conclude the trial court abused its discretion by finding A.Y.'s statements from the interview reliable and permitting them

to be heard by the jury in the form of the videotape and witness testimony.

■ As a result, Nunley's convictions of Counts 3 and 4 must be reversed, as the unreliable hearsay statements were the only evidence supporting those convictions. However, we conclude the admission of this evidence was harmless error as to Counts 1, 2, and 5 because it was merely cumulative of other properly admitted evidence, including A.Y.'s own trial testimony. *See Purvis v. State,* 829 N.E.2d 572, 585 (Ind.Ct.App.2005) ("Improper admission of evidence is harmless error when the erroneously admitted evidence is merely cumulative of other evidence before the trier of fact."), *trans. denied, cert. denied.*

Nunley argues the evidence was not harmless pursuant to *Stone v. State,* 536 N.E.2d 534 (Ind.Ct.App.1989), *trans. denied.* In *Stone,* four adult witnesses and a child testified to the victim's out-of-court statements, and at least one of the adults testified before the victim took the stand. We reversed, because the victim's credibility "became increasingly unimpeachable as each adult added his or her personal eloquence, maturity, emotion, and professionalism to [the victim's] out-of-court statements," so that the "presumption of innocence was overcome long before [Stone] got to the stand." *Id.* at 540.

*Stone* is distinguishable from this case because A.Y. was the first witness to testify and was subject to cross-examination.[7] *See also Modesitt v. State,* 578 N.E.2d 649,

---

7. In a separate section of his brief, titled "The Presentation of this Evidence Violated Mr. Nunley's Right of Confrontation," (Appellant's Br. at 29), Nunley argues his ability to cross-examine A.Y. was "extremely limited" and he was "unable to meaningfully cross-examine A.Y. in front of the jury." (*Id.* at 30.) He cites *Howard v. State,* 853 N.E.2d 461 (Ind. 2006). In *Howard,* the trial court declared the child victim unavailable to testify and admitted her deposition testimony in lieu of

her live testimony. Our Supreme Court held the trial court erred by not following the procedures in the Protected Person Statute in making its determination that the victim was unavailable as a witness. *Id.* at 467. *Howard* is not applicable to Nunley's case because A.Y. testified at trial. Nunley's cross-examination of A.Y. spans forty pages of the transcript, and he does not identify any question that she did not answer satisfactorily.

651 (Ind.1991) (reversing conviction of child molesting where three witnesses told the victim's story before the victim testified, thus effectively precluding Modesitt from effective cross examination of the victim's statement). Nunley argues, without citation to authority, that *Stone* and *Modesitt* are not distinguishable on this ground. However, in *Surber*, we rejected the defendant's argument based on *Stone* for that very reason. *Surber*, 884 N.E.2d at 864. In *Surber*, we also noted the cumulative testimony "was brief, consistent with, and did not elaborate upon [the victim's] testimony." *Id.* The same is true here. Each witness testified only briefly about A.Y.'s allegations and did not elaborate on them, and their testimony was consistent with A.Y.'s. Therefore, we conclude the admission of the cumulative evidence was harmless.

### 2. *Exclusion of Evidence*

■ Nunley argues the trial court erred by excluding evidence A.Y. had made a false accusation to the police on another occasion. T.C. had been the victim of a domestic altercation with her boyfriend, Eddie Foreman, and A.Y. witnessed the altercation. A.Y. initially told police Foreman had also attacked her, but she later recanted that statement. Prior to trial, Nunley sought a ruling that this evidence would be admissible to impeach A.Y. The State argued the evidence was inadmissible under Ind. Evidence Rule 608(b), and the trial court agreed. During Nunley's case-in-chief, defense counsel made a record of the fact that she wanted to call A.Y. to inquire about a false accusation to the police and made an offer of proof.

Evid. R. 608(b) provides:

For the purpose of attacking or supporting the witness's credibility, other than conviction of a crime as provided in Rule 609, specific instances may not be inquired into or proven by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Nunley sought to impeach A.Y. by a specific act of misconduct that did not result in a criminal conviction, and therefore, the trial court correctly excluded the evidence under Evid. R. 608(b). *See Saunders v. State*, 848 N.E.2d 1117, 1122 (Ind.Ct.App. 2006), *trans. denied.* Nunley argues the rule should yield to his right to present a defense, but we rejected that same argument in *Saunders*. *Id.*

■ Nunley also argues the State opened the door to this evidence when the prosecutor, in her closing argument, argued:

So I'm gonna talk about a few reasons as to why you should believe A.Y. First of all, she has no reason to lie. She's six years old. *I submit she hasn't even been taught how to lie.* She knows what's the truth and what's a lie. When you tell the truth, you don't get into trouble. When you tell a lie, you get into trouble, she said. Her [sic] and Eddie were friends. She wanted to go spend the night at his house. She liked going over there and playing with the Nintendo. She liked hanging out with [K.S.] She had no reason to lie.

She's not been coached. If she were coached, she would probably come in here and say exactly, tell you exactly what happened and there you go. But that's not what happened. She cried. She begged not to tell what happened. She didn't want to talk about it. She just wanted to write it down. Was that

coaching? No. There definitely were some statements that were a little bit off. She may have said something at times and maybe said something else. Detective Wibbels, I think, put it right on when he said "the meat and the potatoes were always the same". . . .

And how could you lie? How could you make this up? "He made me suck on his weenie-bob. He licked my pee-pee."

(Tr. at 797–98) (emphasis added).

After closing arguments were completed, Nunley argued that by saying A.Y. had not been taught how to lie, the State had opened the door to evidence about A.Y.'s retraction of her allegations against Foreman. Nunley asked the trial court to "give the jury an additional instruction which [says] evidence is . . . available that [A.Y.] has previously filed a false report with the police, accusing someone else of a crime." (Id. at 816.) The prosecutor argued she had not opened the door because she had specifically argued A.Y. would not have known how to lie when she was six, and the alleged false report was made when she was older. The trial court ruled that it would remind the jury that the comments of lawyers are not evidence and that it was the jury's duty to weigh the evidence and determine credibility.

Regardless of what the prosecutor intended, the statement that A.Y. "hasn't even been taught how to lie" was not unambiguously tied to when A.Y. was six years old. (Id. at 797.) Although the prosecutor noted A.Y. was six, the comment, "she hasn't even been taught how to lie" is in the present tense and is followed by a reference to her trial testimony, which obviously did not happen when she was six. (Id.)

However, to the extent the comment suggested A.Y. did not know how to lie at the time of trial, the statements immedi-

ately following that comment seem to contradict that claim: "She knows what's the truth and what's a lie. When you tell the truth, you don't get into trouble. When tell a lie, you get into trouble, she said." (Id.) If A.Y. understands what a lie is, it stands to reason she also understands how to lie. See Chambers v. State, 734 N.E.2d 578, 581 (Ind.2000) (jury may use its knowledge, experience, and common sense to determine whether witness is credible), reh'g denied. The jury was instructed that the lawyers' comments were not evidence and that the jury had the responsibility of determining credibility. Therefore, we conclude the exclusion of the evidence was not an abuse of discretion.

### 3. Prosecutorial Misconduct

 Nunley argues the prosecutor committed misconduct by arguing A.Y. "hasn't been taught how to lie" when she knew A.Y. had recanted her allegations against Foreman. When evaluating claims of prosecutorial misconduct, we consider whether misconduct in fact occurred. Brown v. State, 746 N.E.2d 63, 69 (Ind. 2001). "If so, we consider whether the misconduct placed the defendant in a position of grave peril." Id. Grave peril is determined by the probable persuasive effect of the misconduct on the jury's decision, not on the degree of impropriety. Id. at 69–70.

 To preserve a claim of prosecutorial misconduct, the defendant is required to object and request an admonition. Watkins v. State, 766 N.E.2d 18, 25 (Ind.Ct.App.2002), trans. denied. If, after an admonition, the defendant is still not satisfied, the proper procedure is to move for mistrial. Id. Failure to request an admonition or move for mistrial results in waiver of the issue. Id. Nunley objected

to the prosecutor's argument and requested an instruction that he had evidence available to him that A.Y. had made a false report to the police on another occasion. The trial court instead instructed the jury on credibility. Nunley made no further objection and did not move for a mistrial. Therefore, his argument is waived. *See id.*

Nunley argues the error was fundamental. We disagree. As discussed above, the comment was confusing and may have exaggerated A.Y.'s truthfulness if the jury did not understand it to be limited to when she was six-years-old. However, we do not think this one sentence was unduly persuasive. The prosecutor listed several legitimate reasons why the jury could credit A.Y. It is the jury's province to decide whether a six- or eight-year-old is capable of lying, and the jury was properly instructed on credibility. Therefore, we conclude that while the prosecutor's statement was improper, there was no fundamental error in the prosecutor's statement during her closing argument.

### 4. *Mistrial*

Finally, Nunley argues the trial court abused its discretion by denying his motion for a mistrial after T.C. referred to "other allegations" she had heard against Nunley. (Tr. at 569.)

Whether to grant or deny a motion for mistrial is a decision left to the sound discretion of the trial court. We will reverse the trial court's ruling only upon an abuse of that discretion. We afford the trial court this deference on appeal because the trial court is in the best position to evaluate the relevant circumstances of an event and its impact on the jury. To prevail on appeal from the denial of a motion for mistrial, the appellant must demonstrate the statement or conduct in question was so prejudicial

and inflammatory that he was placed in a position of grave peril to which he should not have been subjected. We determine the gravity of the peril based upon the probable persuasive effect of the misconduct on the jury's decision rather than upon the degree of impropriety of the conduct.

A mistrial is an extreme sanction warranted only when no other cure can be expected to rectify the situation. Reversible error is seldom found when the trial court has admonished the jury to disregard a statement made during the proceedings, because a timely and accurate admonition to the jury is presumed to sufficiently protect a defendant's rights and remove any error created by the objectionable statement.

*Lehman v. State,* 777 N.E.2d 69, 72 (Ind. Ct.App.2002) (citations omitted).

Nunley argues "[a]ccusations of child molestation are as prejudicial as evidence can get," (Appellant's Br. at 34), and he cites several cases in which we held inadmissible the testimony of witnesses who claimed they had also been molested by the defendant. *See, e.g., Craun v. State,* 762 N.E.2d 230, 239 (Ind.Ct.App.2002), *trans. denied.* However, in Nunley's case, the trial court found the prejudicial effect of T.C.'s comment was minimal because she did not specify the nature of the allegations she had heard. The trial court admonished the jury to disregard T.C.'s statement. We conclude the trial court was within its discretion to deny Nunley's motion for a mistrial.

### CONCLUSION

The statements A.Y. made during her interview at Comfort House lacked sufficient indicia of reliability and should not have been admitted via videotape or witness testimony. Because this inadmissible hearsay is the only evidence supporting

Nunley's convictions for Counts 3 and 4, those convictions must be reversed. However, we conclude there is no reversible error in regard to Nunley's other convictions.

Reversed in part and affirmed in part.

CRONE, J., and BROWN, J., concur.