# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**DANIELLE L. GREGORY**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana



FILED
Aug 07 2012, 9:08 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MATTHEW MANUEL, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1112-CR-1135 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Annie Christ-Garcia, Judge
Valerie Horvath, Master Commissioner
Cause No. 49G17-1109-FD-69526

**August 7, 2012**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Matthew Manuel (Manuel), appeals his conviction for domestic battery, a Class D felony, Ind. Code § 35-42-2-1.3, after a bench trial.

We affirm.

## ISSUES

Manuel raises three issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion when it denied him the opportunity to cross-examine a witness about a past incident;

(2) Whether the trial court abused its discretion when it allowed the State to ask one of its witnesses whether she had testified truthfully; and

(3) Whether the State produced sufficient evidence to prove beyond a reasonable doubt that Manuel committed domestic battery as a Class D felony.

## FACTS AND PROCEDURAL HISTORY

Manuel and D.S. lived together for eight years in a home in Indianapolis, Indiana, and had one child together named D.M. D.S. also had one child from a previous relationship, whom Manuel helped raise during their eight year relationship. On the evening of September 28, 2011, D.S. went out to play Bingo to celebrate her birthday. While D.S. was away, Manuel put the two children to bed in their rooms, although D.M. did not go to sleep right away. D.S. returned home from playing Bingo around 10:30 p.m. and sat down to watch television with Manuel. At one point, Manuel began to talk about his desire to visit Madagascar, so they looked up Madagascar online on D.S.'

2

laptop computer. Later, Manuel went into another room and D.S. began to check her e-mails. When Manuel came back into the room, he saw D.S. delete an e-mail. He demanded to know what she had deleted, but D.S. would not tell him and Manuel hit her on the forehead with a cell phone. They began to argue loudly and Manuel proceeded to examine the files on D.S.' laptop until its battery died and it automatically shut down.

Manuel plugged the laptop's battery charger in and turned the laptop back on, but discovered that it required a password to log in. He asked D.S. for the password, but she refused to give it to him. Manuel began "complaining and yelling and screaming walking through the house." (Transcript p. 38). When D.S. still refused to give him her password, he walked outside and put their daughter's net book computer, which was their second computer, into his car. While Manuel was outside, D.S. called 911 on her cell phone and then put the phone under a pillow on her bed. Manuel returned to the house and continued "yelling and screaming" at D.S. while she was standing in the doorway of their bedroom. (Tr. p. 42). Manuel threw D.S.' laptop on the floor and broke it. He then picked the laptop back up and hit D.S. on the head with it twice before grabbing her from behind and choking her.

D.S. managed to separate herself from Manuel, and shortly thereafter police officers arrived as a result of D.S.' 911 phone call. When the officers arrived, they knocked for about four or five minutes before anyone answered the door. However, they saw a person peek out from the bedroom window through the blinds. Eventually, Manuel answered the door with D.S. standing next to him. The officers noticed that D.S. was

"visibly upset" and was "crying and shaking," but did not have any visible injuries. (Tr. p. 13).

On September 29, 2011, the State filed an Information charging Manuel with Count I, domestic battery, a Class D felony, Ind. Code § 35-42-2-1.3; Count II, battery of a family or household member, a Class D felony, I.C. § 35-42-2-1; Count III, domestic battery, a Class A misdemeanor, I.C. § 35-42-2-1.3; and Count IV, battery, a Class A misdemeanor, I.C. § 35-42-2-1. On November 17, 2011, a bench trial was held, and the trial court found Manuel guilty as charged. On December 1, 2011, the trial court held a sentencing hearing and sentenced Manuel to 365 days on Count I, with 128 days executed and 237 days suspended. The trial court merged Count II with Count I to avoid double jeopardy prohibitions and merged Counts III and IV with Count I as they were lesser included offenses.

Manuel now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Exclusion of Evidence*

During Manuel's cross-examination of D.S. at trial, Manuel elicited testimony that he had been arrested and charged with domestic battery of D.S. in 2005, but that the charges were dropped after D.S. talked to the State. After eliciting this testimony, Manuel asked D.S. whether she had filed a recantation admitting that the abuse had never happened. The State objected to the question, arguing that it was irrelevant and unduly prejudicial to the State because the State did not know the specifics of the incident

without a supplemental statement from that case. In response, Manuel argued that the relevance of the question related to D.S.' credibility as a witness. The trial court sustained the objection, and Manuel requested to make an offer to prove. The trial court allowed the offer, and Manuel asked D.S. whether she had filed a recantation. In response, D.S. admitted that she had. Now, Manuel argues that the trial court abused its discretion when it denied him the opportunity to question D.S. about her recantation at trial.

Preliminarily, we note that the scope and extent of cross-examination is within the discretion of the trial court, and we will reverse only upon finding an abuse of that discretion. *Palmer v. State,* 654 N.E.2d 844, 848 (Ind. Ct. App. 1995). We will find an abuse of discretion where a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Parker v. State,* 965 N.E.2d 50, 53 (Ind. Ct. App. 2012). Although a defendant's right to present a defense is of the utmost importance, it is not absolute. *Id.* "The accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.*

Under Indiana Evidence Rule 607, "The credibility of a witness may be attacked by any party, including the party calling the witness." However, pursuant to Evid. R. 608(a), a party may only attack the credibility of a witness through evidence in the form of opinion or reputation. Evidence regarding specific instances is inadmissible, other than evidence of a conviction of a crime as provided in Evid. R. 609 and evidence

5

concerning the character for truthfulness or untruthfulness of another witness as to which the witness has testified. Evid. R. 608(b).

In a similar vein, the defendant in *Nunley v. State,* 916 N.E.2d 712, 720 (Ind. Ct. App. 2009), *trans. denied,* tried to introduce evidence at trial that the child who claimed that he had molested her had made a false accusation of misconduct on another occasion. The trial court found that the evidence was inadmissible under Evid. R. 608(b) as evidence of a specific instance, and we affirmed. *Id.* As D.S.' 2005 accusation and then recantation were specific instances of conduct similar to the false accusation at issue in *Nunley*, we conclude that evidence of D.S.' recantation here was likewise precluded under Evid. R. 608(b), and the trial court did not abuse its discretion when it did not permit Manuel to cross-examine D.S. about the 2005 charges.

II. *Character Testimony*

Next, Manuel argues that the trial court improperly allowed the State to bolster the truthfulness of D.S.' testimony. At trial, the following exchange occurred:

> [STATE]: [D.S.,] as you sit here today[,] has your testimony been truthful about what happened on September 29th?
> [DEFENSE COUNSEL]: Judge[,] I am going to object to any bolstering of the witness. She's under oath. She knows that she's supposed to tell the truth.
> [STATE]: It wasn't my case in chief, Judge. I think that it's . . . the door's been opened. She's . . . her credibility's been attacked and I have an opportunity to rehabilitate her so it's not bolstering. It's rehabilitation.
> [TRIAL COURT]: The objection will be overruled.
> [STATE]: Are you . . . are you testifying truthfully about the incident that we're here about today?
> [D.S.]: Yes.

6

(Tr. pp. 69-70). According to Manuel, this exchange was prohibited under our rules of evidence.

We review a trial court's decisions regarding the scope and extent of cross-examination for an abuse of discretion. *See Parker,* 965 N.E.2d at 53. We will find an abuse of discretion only where a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

As Manuel argues, Evid. R. 704(b) provides that "[w]itnesses may not testify to [] whether a witness has testified truthfully . . . ." However, we have held that "[a] witness may be rehabilitated on redirect examination if [she] was discredited by [her] testimony on cross-examination." *Embry v. State,* 923 N.E.2d 1, 7 (Ind. Ct. App. 2010), *trans. denied.* Indiana courts have recognized two general rules with respect to witness rehabilitation:

> The first rule is that evidence supporting credibility is admissible only if credibility has been or certainly will be attacked. This is based on the conclusion that, without such an attack, evidence supporting credibility is of insufficient probative value to warrant the time necessary to consider it . . . .
>
> The second principle is that, even if credibility is attacked, evidence supporting credibility is admissible only if it logically refutes the specific focus of the attack . . . .

*Id.* The second principle is generally the more difficult one to apply, as its application requires determining what will logically refute the attack on credibility. *Id.* The answer usually varies depending on the basis for that attack. *Id.*

7

Here, many of Manuel's questions throughout his cross-examination were intended to impeach D.S.' credibility. The following exchanges occurred:

> [DEFENSE COUNSEL]: Okay so before you called 911 your testimony is that there was no contact between the two of you?
> [D.S.]: Yelling and screaming, yes.
> [DEFENSE COUNSEL]: Okay but there was nothing else . . . he hadn't touched you before you called 911?
> [D.S.]: No.
> [DEFENSE COUNSEL]: Okay do you remember me asking you that same exact question out in the hall?
> [D.S.]: Outside[?]
> [DEFENSE COUNSEL]: Yes.
> [D.S.]: Yes he hit me in the head.
> [DEFENSE COUNSEL]: And what was your answer?
> [D.S.]: He hit me in the head with the laptop.
> [DEFENSE COUNSEL]: Okay did you also tell me that he hit you with the cell phone before you called 911?
> [D.S.]: Up front in the living room, yes. Yes, he hit me in the front when we were in the front room living room.
> [DEFENSE COUNSEL]: And this is the first you remember of that just now?
> [D.S.]: No we were busy talking about the issue in the hall—in the hallway and in the bedroom with the laptop.
> [DEFENSE COUNSEL]: But you didn't understand what I just said a second ago that the first time—
> [D.S.]: Did he hit me before?
> [DEFENSE COUNSEL]: I just want to be clear. What you just testified—
> [D.S.]: Okay, I didn't mention it. Okay that's what you're saying.
> [DEFENSE COUNSEL]: So those three times that I just asked you that whether there was any contact before you called 911 you said no. Is that true or not true?
> [D.S.]: When you asked me that you were trying to confuse me, that's why but yes go ahead. We'll just go with that. He hit me once in the head. That's what you're trying to say.
> [DEFENSE COUNSEL]: No I'm not trying to say anything. I'm actually trying to figure out what you're saying. Did he or did he not hit you before you called 911?
> [D.S.]: Yes in the living room.
> [DEFENSE COUNSEL]: And all those times that I just asked you that you didn't understand the question?

8

[D.S.]: Because I wasn't thinking about that stuff. I was worried about the 911 call and him hitting me in the head with the laptop.

[DEFENSE COUNSEL]: Okay so your testimony now is that you didn't understand what I was asking you—

[D.S.]: No I understood what you asked me.

[DEFENSE COUNSEL]: Okay so it was only a verbal fight before you called 911?

[D.S.]: No he also hit me with the cell phone.

[DEFENSE COUNSEL]: Okay but you never told the police that?

[D.S.]: That wasn't even important. The cell phone part wasn't the important thing. Him hitting me on the head with the laptop . . . he could've choked me. He choked me before. He's done it in the house. I'm not even it. My issue's not with the . . . with him being hit me on the . . . on the head with the cell phone. I'm worried about everything else. He's done this before.

(Tr. pp. 53-55).

[DEFENSE COUNSEL]: And during that entire 911 call that we just listened to he didn't leave, did he?

[D.S.]: No he was still in the house.

\*       \*       \*

[DEFENSE COUNSEL]: Okay do you remember when I spoke to you in the hallway . . . ?

[D.S.]: Yeah.

[DEFENSE]: And do you remember telling me that—

[D.S.]: The net book was in the car.

[DEFENSE COUNSEL]: That wasn't my question but do you remember me asking you . . . I'm sorry. Do you remember telling me that he went out to the car twice?

[D.S.]: Yeah.

[DEFENSE COUNSEL]: Okay one time he went out there to take the net book out. That's what you told me.

[D.S.]: No he was already walking out there and he had his jacket on. He went out there and put something out there . . . came back in—

[DEFENSE COUNSEL]: And that's when you called 911.

[D.S.]: Because I looked out the door and I saw him out there. I came back and called 911 and set my phone under the pillow.

[DEFENSE COUNSEL]: Okay and then you told me he left again.

9

[D.S.]: He walked out towards the car. I didn't say he left out of the house. He left . . . outside and went out towards the car.

[DEFENSE COUNSEL]: Out in the hallway you didn't tell me that he went outside twice?

[STATE]: Judge I believe that's what she did just say. She said he went out twice. Once to the car and once outside. I mean that's . . . consistent with what she's testifying to now [].

[TRIAL COURT]: Right and I believe that [defense counsel's] question is, when you discussed the matter in the hallway did you tell [defense counsel] that he had gone out to the car twice like you are saying here currently now?

[D.S.]: I think she had said that I only said once because he had went outside.

[TRIAL COURT]: Does that answer your question? The objection will be overruled.

[DEFENSE COUNSEL]: Judge I can move on from that. That's fine.

(Tr. pp. 60-62). In light of this testimony, we find that Manuel attempted to impeach D.S. as a witness with respect to her truthfulness. Because the impeachment related to truthfulness, we further conclude that questioning D.S. on re-direct regarding whether she had testified truthfully logically refuted the specific focus of Manuel's attack. *See Embry,* 923 N.E.2d at 7. Thus, the State's question was properly intended to rehabilitate its witness, rather than bolster her testimony, and the trial court did not abuse its discretion in allowing the question.

### III. *Sufficiency*

Finally, Manuel argues that the State failed to provide sufficient evidence that he committed domestic battery as a Class D felony. When reviewing a sufficiency of the evidence claim, we will only reverse a conviction when reasonable persons would not be able to form inferences as to each material element of the offense. *Perez v. State,* 872 N.E.2d 208, 212-213 (Ind. Ct. App. 2007), *trans. denied.* We do not reweigh evidence or

10

judge the credibility of witnesses. *Id.* at 213. In addition, we only consider the evidence most favorable to the bench trial and the reasonable inferences stemming from that evidence. *Id.*

A person commits domestic battery if that person: "knowingly or intentionally touches an individual who . . . is or was a spouse of the other person; [] is or was living as if a spouse of the other person as provided in subsection (c); or [] has a child in common with another person; in a rude, insolent, or angry manner that results in bodily injury []." I.C. § 35-42-2-1.3. The offense is a Class D felony if the person commits the offense "in the physical presence of a child less than sixteen (16) years of age, knowing that the child [is] present and might be able to see or hear the offense." I.C. § 35-42-2-1.3.

Manuel's argument has two prongs: (1) that the State did not prove that he committed domestic battery as a Class D felony because it failed to provide sufficient evidence that the battery occurred in the presence of the children; and (2) that the evidence was insufficient because D.S.' testimony was incredibly dubious. We will address each of these assertions separately.

With respect to Manuel's first argument, he claims that he committed the battery within the "proximity" of the children rather than in their "presence" because the children were in their bedroom. We addressed the meaning of "presence" under I.C. § 35-42-2-1.3 in *Boyd v. State,* 889 N.E.2d 321(Ind. Ct. App. 2008), *trans. denied,* and *True v. State,* 954 N.E.2d 1105 (Ind. Ct. App. 2011). Neither case is directly on point because in both cases a child was located in the room where the battery occurred. However, in *Boyd*

11

we held that "presence" under I.C. § 35-42-2-1.3(b)(2) does not require that a child actually sense the battery; it is sufficient that the child *might* see or hear the battery. *Boyd,* 889 N.E.2d at 325. In *True* we further clarified that "presence" for purposes of I.C. § 35-42-2-1.3(b)(2) is "defined as knowingly being within either the possible sight or hearing of a child." *True,* 954 N.E.2d at 1111. From this precedent, we conclude that the critical question in determining whether a child is "present" for purposes of the statute is whether a reasonable person would conclude that the child might see or hear the offense; not whether the child is in the same room as where the offense is taking place.

In the instant case, although both children were in their bedroom and were supposedly asleep, much of the parents' argument occurred in the hallway outside of their room, and seven year old D.M. testified that her door was open and that she could hear her father asking her mother for the laptop password. According to D.M., her father was "this loud," and hearing the argument made her "sad." (Tr. p. 25). Further, Manuel was aware that the children might hear him. On the 911 tape, D.S. repeatedly requested Manuel to lower his voice to avoid waking the children, and he responded "I don't care if the kids wake up." (State's Exh. 7). In light of these facts and our precedent, we conclude that the State did produce sufficient evidence that Manuel committed domestic battery as a Class D felony in the presence of the children.

Next, Manuel argues that the State did not present sufficient evidence that he committed domestic battery because D.S.' testimony was incredibly dubious and inherently improbable due to inconsistencies. Specifically, Manuel notes that D.S.

12

testified that Manuel was intoxicated, but D.M. and Manuel's sister testified that he had not been drinking that day. Also, D.S. left for work at 6:30 in the morning and did not return until around 4:00 p.m. She left again at 5:00 p.m. to play Bingo and did not return to the house until 10:30 p.m. Based on D.S.' minimal time at home, Manuel claims that she could not have known whether he was drinking.

In addition, Manuel claims that D.S.' testimony was incredibly dubious because the 911 recording of the incident did not indicate that Manuel smashed the laptop or hit her. Instead, about five minutes into the recording, Manuel yelled "get off me," and about two minutes later he yelled "fall back" two times. (State's Exh. 7). About eight minutes into the recording, Manuel asked D.S. why she was screaming, and then when D.S. yelled "why are you hitting me[?]" Manuel responded "I ain't touched you" and continued to ask why D.S. was screaming. (State's Exh. 7). D.S. again asked Manuel why he was hitting her, and he responded "ain't nobody whipped your ass" and then, in response to D.S. sobs, "save that fake shit for somebody else." (State's Exh. 7).

Finally, Manuel argues that D.S.' testimony was incredibly dubious because although D.S. initially reported that the only physical acts against her occurred after she called 911, she later testified that Manuel had hit her on the head with the cell phone prior to the 911 call. Also, according to Manuel, it was impossible for him to hit D.S. with the

13

laptop when evidence indicated that he had placed the laptop into his vehicle before D.S. called 911.[1]

Under the "incredible dubiosity rule," this court may impinge upon the jury's responsibility to judge the credibility of witnesses when confronted with inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony. *Lawson v. State*, 966 N.E.2d 1273, 1281 (Ind. Ct. App. 2012). If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed. *Fajardo v. State*, 859 N.E.2d 1201, 1208 (Ind. 2007). Application of this rule is rare, though, and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it. *Morrell v. State,* 933 N.E.2d 484, 492 (Ind. Ct. App. 2010). This incredibly dubiosity rule applies only when a witness contradicts himself or herself in a single statement or while testifying, and does not apply to conflicts between multiple statements. *Glenn v. State,* 884 N.E.2d 347, 356 (Ind. Ct. App. 2008), *trans. denied*. Inconsistencies in the testimonies of two or more witnesses go to the weight of the evidence and do not make the evidence "incredible" as a matter of law. *Morrell,* 933 N.E.2d at 492-93.

In light of this standard, three of Manuel's arguments fail because he requests us to reweigh inconsistencies between witness testimony and the evidence or between the

---

[1] As we have already concluded that the trial court did not abuse its discretion in finding that D.S.' testimony regarding the 2005 domestic abuse charges was inadmissible, we will not address Manuel's remaining claim under the "incredible dubiosity rule" that D.S. contradicted herself in that testimony.

testimonies of multiple witnesses, which we may not do under the "incredible dubiosity rule." *See Glenn,* 884 N.E.2d at 356. D.S. and Manuel's sister disagreed about Manuel's intoxication, but inconsistencies between two witnesses' testimonies do not make the evidence "incredible." *See Morrell,* 933 N.E.2d at 492-93. Similarly, we cannot compare inconsistencies between D.S.' testimony and the 911 recording because they are not a single statement or testimony. *See Glenn,* 884 N.E.2d at 356. Likewise, Manuel does not identify contradictions in D.S.' testimony concerning the computer in Manuel's vehicle. D.S. testified that the computer was her daughter's net book, not Manuel's laptop, and she never deviated from that testimony. As a result, it was consistent for her to claim that Manuel hit her with a computer after he took the net book to the vehicle.

Manuel's only claim that we can review under the "incredible dubiosity rule" is that D.S. was inconsistent in her testimony concerning Manuel hitting her in the head with his cell phone. D.S. did seemingly contradict herself because initially she testified that the first time Manuel hit her was with the laptop, and then she later testified that Manuel first hit her with the cell phone. However, we do not find this testimony incredible because it is evident based on the following exchange that D.S. was confused:

> [DEFENSE COUNSEL]: Okay did you also tell me that he hit you with the cell phone before you called 911?
> [D.S.]: Up front in the living room, yes. Yes, he hit me in the front when we were in the front room living room.
> [DEFENSE COUNSEL]: And this is the first you remember of that just now?
> [D.S.]: No we were busy talking about the issue in the hall—in the hallway and in the bedroom with the laptop.
> [DEFENSE COUNSEL]: But you didn't understand what I just said a second ago that the first time—

15

[D.S.]: Did he hit me before?

[DEFENSE COUNSEL]: I just want to be clear. What you just testified—

[D.S.]: Okay, I didn't mention it. Okay that's what you're saying.

[DEFENSE COUNSEL]: So those three times that I just asked you that whether there was any contact before you called 911 you said no. Is that true or not true?

[D.S.]: When you asked me that you were trying to confuse me, that's why but yes go ahead. We'll just go with that. He hit me once in the head. That's what you're trying to say.

[DEFENSE COUNSEL]: No I'm not trying to say anything. I'm actually trying to figure out what you're saying. Did he or did he not hit you before you called 911?

[D.S.]: Yes in the living room.

[DEFENSE COUNSEL]: And all those times that I just asked you that you didn't understand the question?

[D.S.]: Because I wasn't thinking about that stuff. I was worried about the 911 call and him hitting me in the head with the laptop.

[DEFENSE COUNSEL]: Okay so your testimony now is that you didn't understand what I was asking you—

[D.S.]: No I understood what you asked me.

[DEFENSE COUNSEL]: Okay so it was only a verbal fight before you called 911?

[D.S.]: No he also hit me with the cell phone.

[DEFENSE COUNSEL]: Okay but you never told the police that?

[D.S.]: That wasn't even important. The cell phone part wasn't the important thing. Him hitting me on the head with the laptop . . . he could've choked me. He choked me before. He's done it in the house. I'm not even it. My issue's not with the . . . with him being hit me on the . . . on the head with the cell phone. I'm worried about everything else. He's done this before.

(Tr. pp. 53-55). We do not find it incredible that a reasonable person would believe that D.S. was telling the truth and was merely confused or initially forgot to mention the phone. It is clear from her testimony that the cell phone was not the most important thing on her mind; rather, she testified that at that point she was afraid for her life. Thus, we conclude that the State provided sufficient evidence to support Manuel's conviction of domestic battery as a Class D felony.

16

Based on the foregoing, we conclude that: (1) the trial court did not abuse its discretion when it denied Manuel the opportunity to cross-examine D.S. about a past incident; (2) the trial court did not abuse its discretion when allowed the State to ask D.S. whether she had testified truthfully; and (3) the State produced sufficient evidence to prove beyond a reasonable doubt that Manuel committed domestic battery as a Class D felony.

Affirmed.

NAJAM, J. and DARDEN, S. J. concur