**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 20 2012, 9:24 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL R. FISHER**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**NICOLE M. SCHUSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ROBERT WENDEL, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1201-CR-2 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Robert Altice, Judge
Cause No. 49G02-1011-FA-082803

**September 20, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

Robert Wendel ("Wendel") was convicted in Marion Superior Court of Class A felony robbery, Class B felony burglary, Class B felony criminal confinement, Class B felony aggravated battery, and Class A misdemeanor invasion of privacy and sentenced to an aggregate sentence of forty years. Wendel appeals and presents two issues, which we restate as: (1) whether certain comments made by the prosecuting attorney during closing argument constitute fundamental error, and (2) whether Wendel's sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

**Facts and Procedural History**

Wendel and his wife Judy were married in 1966 and had three children: a son, Robert Jr. ("Rob"), and two daughters.[1] The couple owned and operated an auto salvage yard. Wendel was the general manager, and Judy did the payroll and accounting. Judy owned 55% of the salvage yard business, and Wendel owned 45% of the business.

In 2008, Wendel decided that he no longer desired to work at the family business and wanted to sell his share thereof. Judy did not object, and her son Rob took over as general manager of the salvage yard. Wendel and Judy argued about the amount of money Wendel was taking from the business, and Judy filed for divorce in January 2010.

In March 2010, Judy left the marital home and moved in with her son Rob in Indianapolis. Judy later moved into a rental home on the eastside of Indianapolis. In July 2010, Judy obtained a protective order against Wendel. Then in September of that year,

---

[1] The couple divorced in 1982 only to remarry in 1983.

the dissolution court entered a provisional order giving Judy sole control over the salvage yard business.

On Wednesdays, Judy had typically taken the business paperwork home with her and processed it there, often having large amounts of cash on her, and she continued that practice after the divorce. One Wednesday in October 2010, Judy returned home with $3,000 to $4,000 in cash from the business and noticed that her dog was missing from the back yard. Concerned about her safety, she spent the night at her sister's house.

On Wednesday, October 27, 2010, Judy returned to the home she was renting and her dog had again disappeared from her back yard. After processing her paperwork, Judy placed it in her briefcase and put the briefcase by the dresser in her bedroom. Judy then fell asleep at approximately 10:30 p.m. Later that night, Judy was awakened by someone holding her down with his knee in her back, trying to place a rag in her mouth to gag her. Judy immediately recognized that this was her husband, Wendel. Judy told him, "Bob, stop it." Tr. p. 158. This caused Wendel to stand up and exit the bedroom. Another man was in the room with Wendel. This man then flipped Judy onto her back, sat on her, and told her, "I'm not Bob." Id. at 160. The man then started to strike Judy in the face. Judy was able to reach to the side of her bed where she kept a handgun. Judy grabbed the gun, pointed it at the man, and pulled the trigger, but the gun did not fire. The man took the gun from Judy, hit her in the head with it, and asked her where the money was. Judy then lost consciousness.

When Judy regained consciousness, she was on her bedroom floor, with the other man again on top of her. He asked her, "Where's the money, bitch? Where's the drugs?"

3

Tr. p. 164. Judy told the man where her money and prescription drugs were located, and noticed that her briefcase had already been taken. She then saw Wendel come out of the bathroom and walk over to the vanity, where he momentarily pulled up his ski-mask. This allowed Judy to confirm that this was her husband by seeing his face in the mirror on the vanity. She also saw that he was wearing white latex gloves like the ones he used to work on cars at the salvage yard. Wendel then came over to Judy and began to kick her in the side and hit her in the knees with a metal bar. Judy again lost consciousness.

When Judy regained consciousness, she was in the living room, with the other man taping her hands together. The man dragged Judy to her feet, then let her fall to the ground, declaring, "She's dead." Tr. p. 170. Judy then lost consciousness yet again. When Judy regained consciousness again, she was alone in her house. Despite her injuries, she was able to crawl to the laundry room to look for her car keys and opened the garage door. But when she tried to go down the stairs into the garage, she again lost consciousness. When she regained consciousness, she was shivering due to the cold air in garage. Convinced that she was dying, Judy wrote her husband's name, "Bob," in her own blood on the garage floor so that her children would know who had done this to her. Still, she managed to get into and start her car. Unable to use her hands, she honked the horn with her head as she slipped in and out of consciousness.

One of Judy's neighbor's saw Judy's car in the middle of the street, facing the driveway with the motor running. The neighbor called the police, and the dispatcher told the neighbor to ask Judy who had injured her. Judy responded, "Bob Wendel." Tr. p. 51. When the police arrived, they broke the car window and removed Judy from the car.

4

Judy was taken to the hospital where medical personnel discovered that her ribs and shoulder blade were broken and her hand bones were crushed. She suffered from extensive bruising and received over 110 stitches in her head. Judy also had to undergo reconstructive surgery to her hands.

After she was released from the hospital, Judy returned home to find that her purse, which contained her cash, checks, credit card, and iPod, were missing. Also missing were two firearms she had in her house. Later, the property manager for the housing addition where Judy lived found a black bag near a perimeter fence near Judy's home. A knife was also found nearby. Inside the bag were white latex gloves and a camera lens cover. The partial DNA profile obtained from the bag, gloves, and lens cover matched Wendel's DNA. The possibility that this partial DNA profile matched someone other than Wendel was one in 1.1 billion. Judy testified that the black bag looked like the one in which Wendel kept his night-vision binoculars.

Before the attack, Wendel had told his family and friends that he was going on a trip to Las Vegas, Nevada. He told his brother that he was near St. Louis, Missouri en route to Nevada on the night that Judy was attacked. However, Wendel's GPS unit indicated that he did not leave for Nevada until the day after Judy was attacked.

On November 4, 2010, the State charged Wendel as follows: Count I, Class A felony Robbery; Count II, Class A felony burglary; Count III, Class B felony criminal confinement; Count IV, Class B felony aggravated battery; Count V, Class C felony battery; Count VI, Class C felony battery; Count VII, Class A misdemeanor invasion of privacy; and Count VIII, Class A misdemeanor domestic battery.

A jury trial was held on November 14 through November 16, 2011. During the State's cross-examination of Wendel, the prosecuting attorney asked if Wendel remembered sending a letter to his wife that stated, "you're not stupid and if I do something, you're not ever going to figure it out." Tr. p. 675. Wendel testified that he did not recall sending such a letter to his wife. The State also never put this letter into evidence. Nevertheless, during closing arguments, the prosecuting attorney referred to the contents of this letter. The prosecuting attorney also stated that Wendel's trial counsel was attempting to "finagle" things and "pull tricks out of his hat." Tr. pp. 746-47. At the conclusion of the trial, the jury found Wendel guilty as charged.

At a hearing held on December 7, 2011, the trial court entered judgments of conviction on Counts I, III, IV, and VII as charged. The trial court entered judgment of conviction on Count II as Class B felony burglary and "merged" Counts V, VI, and VIII with Count IV. The trial court then sentenced Wendel to the advisory sentence of thirty years on Count I and the advisory sentence of ten years on Counts II, III, and IV. The court imposed a sentence of one year on the misdemeanor conviction in Count VII. The trial court ordered the sentences in Counts I and II to be served consecutively, but ordered the other sentences to be served concurrently with the sentence in Count I. Thus, the trial court imposed an aggregate sentence of forty years. Wendel now appeals.

## I. Prosecutorial Misconduct

Wendel first claims that the prosecuting attorney committed misconduct by referring to a letter that was not in evidence during the State's closing argument, and to characterizing the defense counsel's efforts as trying to "pull tricks out of his hat" and

"finagle" things. Tr. pp. 746-49. The State concedes that these comments were improper but notes that Wendel made no objection to these comments during trial.

To preserve a claim of prosecutorial misconduct, the defendant must object and request an admonishment. Nutley v. State, 916 N.E.2d 712, 721 (Ind. Ct. App. 2009), trans. denied. If the defendant is not satisfied with the admonishment given, the proper procedure is to then move for a mistrial. Id. The failure to request an admonishment or move for a mistrial results in waiver of the issue on appeal. Id. Because Wendel did not object to the prosecuting attorney's statements at trial, request an admonishment, or move for a mistrial, his claim of prosecutorial misconduct is waived.

In an attempt to avoid waiver, Wendel argues that the prosecuting attorney's statements amounted to fundamental error. Where a claim of prosecutorial misconduct has been properly preserved, the reviewing court must determine whether the prosecutor engaged in misconduct, and if so, whether the misconduct, under all of the circumstances, placed the defendant in a position of "grave peril" to which he should not have been subjected. Coleman v. State, 946 N.E.2d 1160, 1166 (Ind. 2011). But where, as here, a claim of prosecutorial misconduct has not been properly preserved, the defendant must establish not only the grounds for the misconduct, but also the additional grounds of fundamental error. Id. "The fundamental error exception is extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." Brown v. State, 929 N.E.2d 204, 207 (Ind. 2010) (quotations omitted). To be deemed fundamental, "[t]he error claimed must either make a fair trial impossible or

7

constitute clearly blatant violations of basic and elementary principles of due process." Id. (quotations omitted).

We cannot say that the prosecuting attorney's reference to the letter that was not in evidence rose to the level of fundamental error. Although the prosecuting attorney should not have referred to this letter, the reference was brief and not repeated. We also do not condone the prosecuting attorney's comments regarding the defense counsel "pull[ing] tricks out of his hat" or that the defense was attempting to "finagle" its way out of certain facts. Tr. p. 746.

But we cannot overlook the fact that the jury was properly instructed that unsworn comments of counsel were not to be considered as evidence. Appellant's App. p. 172. The jury was also instructed that they were to determine the facts from the testimony and evidence admitted by the trial court in the presence of the jury and to disregard all other information. Id. On appeal, we presume that the jury followed the trial court's instructions. Morgan v. State, 903 N.E.2d 1010, 1019 (Ind. Ct. App. 2009), trans. denied. Moreover, the evidence against Wendel was strong. His wife of many years made an eyewitness identification of him as one of her attackers. The partial DNA profile found on the items located near Judy's residence matched Wendel's DNA. And Wendel lied about being out of state at the time of the attack.

Under these facts and circumstances, we cannot say that this brief, isolated reference to a letter that was not in evidence placed Wendel in "grave peril," much less made a fair trial impossible. The same is true with regard to the prosecutor's remarks regarding defense counsel. Although these comments were the prosecutor's

unprofessional remarks, they did not make a fair trial impossible. See Robinson v. State, 693 N.E.2d 548, 551-52 (Ind. 1998) (holding that prosecutor's comments disparaging defense counsel and insinuating that defense counsel was trying to mislead the jury did not amount to fundamental error); Washington v. State, 902 N.E.2d 280, 291 (Ind. Ct. App. 2009) (holding that prosecutor's comments that defense counsel was unethical, inappropriate, ignorant, and improper in his characterization of the evidence were improper but did not amount to fundamental error in light of jury instruction that the arguments of counsel were not evidence and defendant made no showing that comments had any likely effect on the jury's verdict).

## II. Appellate Rule 7(B)

Wendel also claims that his forty-year sentence is inappropriate. Pursuant to Indiana Appellate Rule 7(B), we may revise a sentence otherwise authorized by statute if, "after due consideration of the trial court's decision, [we] find[] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Although we have the power to review and revise sentences, "[t]he principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind. 2008). Our review under Appellate Rule 7(B) should focus on "the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." Id. On appeal, it is

9

the defendant's burden on appeal to persuade us that the sentence imposed by the trial court is inappropriate. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

Here, the heinous nature of Wendel's offenses justifies the trial court's decision to impose an aggregate sentence of forty years. Wendel broke into the home of his wife of over forty years and actively participated in a vicious, brutal attack on her, leaving her for dead. Judy wrote her husband's name in her own blood so that her children would know that their father was the perpetrator. As noted by the trial court, the crime appears to have been premeditated and planned. Wendel's crimes have also affected his family. Wendel's son testified at the sentencing hearing that his own son, who has "special needs" now sleeps with a pocket knife and a baseball bat to protect himself from a feared attack by his grandfather. Tr. pp. 786-87.

Wendel's character further supports the trial court's sentencing decision. Although Wendel did not have an extensive criminal history, he did have a conviction for misdemeanor battery in 1986. He also sent a text message to Judy during the jury's deliberations, stating, "Deary Judy you have always been the one and only love of my life. I always dreamed and hoped we would share each others [sic] last breath together. I'm sorry that I made your life so miserable[.]" Ex. Vol. III, p. 275. Although this may appear to be an attempted apology for his crimes, it is important to note that, when the message was sent, Wendel was on trial for a brutal assault on his wife, in violation of a protective order; yet he still contacted his victim during the middle of trial. This does not speak well to his character.

In short, after giving due consideration to the trial court's sentencing decision, Wendel's aggregate sentence of forty years is not inappropriate in light of the nature of the offense and the character of the offender.

## Conclusion

The comments made by the prosecuting attorney during closing arguments may have been improper, but they did not constitute fundamental error. Wendel's forty-year aggregate sentence is not inappropriate.

Affirmed.

VAIDIK, J., and BARNES, J., concur.