**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 29 2014, 9:36 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JAMES W. MCNEW**
Greenfield, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MARJORIE LAWYER-SMITH**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| COLBY R. MCKNELLY, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 30A05-1307-CR-378 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HANCOCK CIRCUIT COURT
The Honorable Richard D. Culver, Judge
Cause No. 30C01-1212-MR-1947

**August 29, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

## STATEMENT OF THE CASE

Colby McKnelly ("McKnelly") appeals his convictions and sentence, after a bench trial, for murder[1] and Class C felony battery with a deadly weapon.[2] On appeal, McKnelly argues that the State committed prosecutorial misconduct by eliciting testimony violating Rule 404(b) of the Indiana Rules of Evidence, that his convictions are not supported by sufficient evidence, and that his sentence is inappropriate and should be revised pursuant to Indiana Appellate Rule 7(B). Finding that the State did not commit prosecutorial misconduct, that sufficient evidence supports his convictions, and that his sentence is appropriate in light of his character and the fact that McKnelly stabbed and hit the victim a total of fifty-four (54) times, we affirm McKnelly's convictions and sentence.

We affirm and remand.[3]

## ISSUES

1. Whether the State committed prosecutorial misconduct in the presentation of its evidence.

2. Whether sufficient evidence supports McKnelly's convictions.

3. Whether McKnelly's sentence is inappropriate.

---

[1] INDIANA CODE § 35-42-1-1.

[2] I.C. § 35-42-2-1(a)(3) (2012).

[3] Both parties direct our attention to an error in the Abstract of Judgment. The recitation of McKnelly's battery charge reads as "Battery Resulting in Serious Bodily Injury," even though the trial court convicted him of battery by means of a deadly weapon. (App. 290). The Indiana Code citation for both is the same, and the trial court said during trial and at sentencing that McKnelly was guilty of battery by means of a deadly weapon. We remand solely for the purpose of correcting the Abstract of Judgment to read "Battery by Means of a Deadly Weapon" rather than battery resulting in serious bodily injury.

FACTS

In December 2012, McKnelly and Jessi Parsons Freeman ("Freeman") were dating and living together. On December 23, 2012, McKnelly and Freeman went shopping and later went to the home of Steven Rogers ("Rogers"). McKnelly and Freeman stayed at Rogers's house for about an hour before they all left to buy food and alcohol. All three then went back to McKnelly's house.

At McKnelly's house, everyone was drinking, listening to music, and playing pool. At some point, McKnelly and Freeman began to argue, and McKnelly struck Freeman. She then hid from McKnelly so that she could later sneak out of the house. McKnelly found Freeman and dragged her back into a bedroom. Eventually, they both went to sleep. At 4 A.M., McKnelly woke Freeman up and told her that he wanted to go to the home of Chris Cave ("Cave"). McKnelly and Freeman drove to Cave's house, which was a few blocks away. Rogers did not go to Cave's house and stayed at McKnelly's.

When McKnelly and Freeman arrived at Cave's home, McKnelly told Freeman that he "hope[d] there's no kids in there because [he's] going to kill everybody." (Tr. 620). McKnelly sent a text message to Cave, and Cave responded that he did not want any company. Raymond Kalchthaler ("Kalchthaler") was staying with Cave and was also friends with McKnelly. McKnelly called Kalchthaler, and Kalchthaler went outside to meet McKnelly and Freeman. When Kalchthaler exited the house, Freeman left the car and walked toward McKnelly's house. McKnelly and Kalchthaler got in the car and followed her.

3

Once they arrived at McKnelly's house, McKnelly turned into the driveway, got out of the car, and began arguing with Freeman. Kalchthaler exited the car and walked toward a gas station, as he did not want to be involved in their argument. McKnelly told Freeman to go in the house, and she refused. McKnelly then got behind Freeman in an effort to push her towards the house. At some point while pushing Freeman toward the house, McKnelly cut her elbow with a knife. Freeman again told McKnelly that she did not want to go in the house and that she wanted to leave. McKnelly told Freeman that if she left, he would kill her.

Kalchthaler came back to McKnelly's house soon afterward, and saw Freeman on a bed crying and holding her arm. Kalchthaler testified that he felt very uneasy walking through the house, that "the atmosphere was heavy," and that "[he] felt like it was almost directed toward [him]." (Tr. 320). McKnelly and Kalchthaler went outside to the front porch. Freeman came outside and asked Kalchthaler for a cigarette, and McKnelly told her to go back in the house. Rogers was in the kitchen eating, and Freeman told him that McKnelly had cut her. McKnelly told Rogers that Freeman had jumped out of the car and that her injuries were road rash. McKnelly took Freeman to the bathroom and put gauze and a bandage around her elbow wound. While doing so, McKnelly told Freeman that she "saved [Kalchthaler's] ass." (Tr. 626).

After bandaging the wound, McKnelly told Freeman that he was going to kill Rogers. Freeman asked McKnelly why and told him that they should take Rogers home instead. Rogers was walking through the house when McKnelly began saying disparaging remarks about himself. According to Freeman's testimony, Rogers told

4

McKnelly "there's nothing wrong with you dude." (Tr. 627). Rogers then tried to give McKnelly a hug, but McKnelly stabbed him in the chest. Rogers grabbed a knife that was nearby and stabbed McKnelly. The two fought, and McKnelly got behind Rogers and stabbed him over fifty (50) times in the back of his head, neck, and back. Eventually the men stopped fighting and stumbled through the living room of the house. Rogers took out his cell phone and, according to Freeman, called his grandmother to "tell her bye." (Tr. 631). McKnelly grabbed the phone from Rogers and hit him on the head with a thick, metal flashlight at least four times. Freeman and McKnelly left Rogers in the house and fled in McKnelly's car. Freeman drove McKnelly to his mother's home, and told her not to tell his mother what had happened and to say he had acted in self-defense. Freeman dropped McKnelly off at his mother's house. She then went to her parents' house and asked her father to call 911. Officers went to McKnelly's house and found Rogers, who had died from his injuries.

On December 27, 2012, the State charged McKnelly with murder, Class B and Class C felony criminal confinement, Class C felony battery, Class D felony intimidation, and Class A misdemeanor domestic battery. McKnelly waived his right to a jury trial, and the trial court held a bench trial June 11, 2013. Before the trial began, the State dismissed several charges and went forward on the murder and felony battery charges. McKnelly testified on his own behalf and stated that Rogers started the fight by stabbing him in the chest. McKnelly further testified that he was afraid for his life and was defending himself from Rogers. The trial court found McKnelly guilty of both charges and set the matter for sentencing on July 29, 2013.

5

At sentencing, the trial court found that the circumstances of the murder, McKnelly's criminal history, and his lack of remorse were aggravating factors. The trial court did not find any mitigating circumstances and sentenced McKnelly to sixty-five (65) years executed on his conviction for murder and eight (8) years executed for the C felony battery conviction. The trial court ordered the sentences to run consecutively for an aggregate term of seventy-three (73) years executed in the Department of Correction. McKnelly now appeals. We will include additional facts as necessary.

<u>DECISION</u>

McKnelly argues that his convictions should be overturned because the State committed prosecutorial misconduct and because of a lack of sufficient evidence supporting his convictions. He also claims that his sentence is inappropriate in light of the nature of the offenses and his character.

1. <u>Prosecutorial Misconduct</u>

McKnelly claims that the State engaged in prosecutorial misconduct by eliciting testimony that violated Rule 404(b) of the Indiana Rules of Evidence. In reviewing a properly preserved claim of prosecutorial misconduct, we must first determine whether the prosecutor's conduct was improper. *Newsome v. State*, 686 N.E.2d 868, 875 (Ind. Ct. App. 1997). If we determine the conduct was improper, we must then determine whether, under all of the circumstances, the prosecutor's misconduct placed the defendant in a position of grave peril. *Id*. In deciding whether the defendant was placed in grave peril, we consider the probable persuasive effect of the misconduct on the fact-finder's decision. *Id*.

6

"[A]n appellate claim of prosecutorial misconduct presented on appeal in the absence of [a] contemporaneous trial objection will not succeed unless the defendant established not only the grounds for prosecutorial misconduct but also the additional grounds for fundamental error." *Booher v. State*, 773 N.E.2d 814, 818 (Ind. 2002). Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). Fundamental error makes "a fair trial impossible or constitute[s] clearly blatant violations of basic elementary principles of due process . . . presen[ting] an undeniable and substantial potential for harm." *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002).

McKnelly points to four instances of alleged prosecutorial misconduct, but only objected to three. He essentially argues that all four instances of misconduct were attempts to "destroy his credibility" with the improper introduction of prior bad acts, wrongs or other criminal activity in violation of Rule 404(b). (McKnelly's Br. 10).

McKnelly complains about the following two exchanges:

Q   Can you describe your interactions with the Defendant after you met him?

A   Uh, well me and Colby never really got [along] until like at the very end, I thought, you know we was [all right]. I know uh, we've had an incident about, because I smacked his girlfriend's ass, you know, can I say that?

Q   Sure.

A   I smacked her.

Q   Speak up please.

7

A       I smacked his girlfriend's butt when I didn't know that was his girlfriend. I had uh, I found, I heard that he said that uh, some things about that, said he was going to kill me. Uh, I confronted him on that, he pulled a knife out on me once and on uh, when that happened...

BY ATTORNEY TOMPKINS: Your Honor, objection. Move to strike. I would ask the State to caution the witness against uncharged misconduct.

(Tr. 252-53). The second alleged instance of prosecutorial misconduct was as follows:

Q       Okay. What were you guys talking about in the vehicle?

A       Uh, nonsense about uh, some methamphetamine uh, ...

BY ATTORNEY TOMPKINS: Your Honor, objection. Uncharged misconduct, I'm going to have to move to strike that portion of the answer.

BY THE COURT: Respond or move on Mr. Spears.

BY ATTORNEY SPEARS: Uh, the response, uh, just move on.

(Tr. 309-10).

In reviewing these exchanges, both answers were given in response to otherwise proper questions. Because the State did not specifically ask questions to illicit the above-mentioned testimony, no prosecutorial misconduct took place. *See, e.g.*, *Ratliff v. State*, 741 N.E.2d 424, 430 (Ind. Ct. App. 2000) (No misconduct on the State's part where the questions asked "did not seek inflammatory or clearly improper answers, nor did the testimony establish any elements of the charged crimes"), *trans. denied*.

McKnelly also alleges that the State elicited "impermissible 404(b) testimony from Charity Reier ("Reier") regarding a prior argument between McKnelly and Freeman" a few days before McKnelly cut Freeman and killed Rogers. (McKnelly's Br.

8

9). McKnelly objected to the following answer from Reier describing an incident between Freeman and himself:

> A few days prior to that uh, Jessi was going out to eat with a friend and when she had got back she had wanted to leave again, or with her. . . . And [Freeman and McKnelly] started to argue and they left my house walking. . . . Colby and Jessi started to argue and they left walking. . . . Uh, and me and Ashley picked her up at uh, Shane's Tattoo shop here in Greenfield. . . . Ashley had went in to get Jessi uh, they ran out to the car. . . . And when they were coming out to the car Colby was running down the street and kicked the car when, or hit it or kicked it.

(Tr. 345-46) In response to McKnelly's objection, the State responded that "the case law is where there's a relationship that has conflict or there's been witnessed conflict[,] it can come in based on the fact that there's confrontation between the victim and the defendant to show relationship as well as the motive." (Tr. 344-45).

Indeed, in *Iqbal v. State*, 805 N.E.2d 401, 408 (Ind. Ct. App. 2004), we stated that "[n]umerous cases have held that where a relationship between parties is characterized by frequent conflict, evidence of the defendant's prior assault and confrontations with the victim may be admitted to show the relationship between the parties and motive for committing the crime." Again, where the State's question was not improper and the testimony elicited was admissible, no prosecutorial misconduct took place. *See Ratliff*, 741 N.E.2d at 430.

Finally, McKnelly alleges prosecutorial misconduct when the State elicited testimony from Freeman about McKnelly hitting her earlier in the evening of December 23:

Q    Okay. Once you're inside what did you all do?

9

A       Drank, listen to music, they played pool.

Q       How were they getting along at that point?

A       Fine.

Q       What happens next?

A       Me and Colby get into it.

Q       Okay, you get in a fight with Colby?

A       Yes.

Q       Verbal argument?

A       Started verbal and I said I wanted to leave.  I was texting Charity.

Q       Okay.

A       He hit me.

(Tr. 614).  However, McKnelly did not make a timely objection.  Therefore, he must establish "not only the grounds for prosecutorial misconduct but also the additional grounds for fundamental error."  *Booher*, 773 N.E.2d at 818.  Because Freeman's testimony is admissible under *Iqbal*, McNelly has not established either prosecutorial misconduct or fundamental error.  Accordingly, the State did not commit prosecutorial misconduct in any of the instances McKnelly alleges.

2. Sufficiency of the Evidence

McKnelly argues that the evidence was insufficient to support his convictions. Specifically, McKnelly claims that he presented a valid claim of self-defense, that the State failed to rebut his claim, and that we should disregard Freeman's testimony under the "incredible dubiosity rule."

10

We review a challenge to the sufficiency of evidence to rebut a claim of self-defense in the same manner as any sufficiency claim in that we neither reweigh the evidence nor judge the credibility of witnesses. *Wilson v. State*, 770 N.E.2d 799, 801 (Ind. 2002). We will not overturn a conviction if there is sufficient evidence of probative value to support the conclusion of the trier-of-fact. *Id.* "A valid claim of self-defense of oneself or another person is legal justification for an act that is otherwise defined as criminal." *Id.* at 800. To present a valid claim of self-defense, a defendant must show that he: (1) was in a place where he had a right to be; (2) did not provoke, instigate, or participate willingly in the violence; and (3) had a reasonable fear of death or great bodily harm. *Id.* The amount of force that an individual may use to protect himself must be proportionate to the urgency of the situation. *Hollowell v. State*, 707 N.E.2d 1014, 1021 (Ind. Ct. App. 1999). When a person uses more force than is reasonably necessary under the circumstances, the right of self-defense is extinguished. *Id.* A defendant's conviction, despite a claim of self-defense, will not be reversed unless no reasonable person can say that the State negated the claim beyond a reasonable doubt. *Mariscal v. State*, 687 N.E.2d 378, 381 (Ind. Ct. App. 1997), *trans. denied*.

Here, McKnelly argues that his self-defense claim is valid because he testified, contrary to Freeman's assertion, that Rogers stabbed him first. This is simply a request that we discount Freeman's testimony. We decline to do so. *See Wilson*, 770 N.E.2d at 801. In addition, the State's case-in-chief, particularly the coroner's report, provides sufficient circumstantial evidence rebutting McKnelly's claim of self-defense. The report details at least fifty (50) stab or laceration wounds to Rogers. Seventeen (17) of those

11

wounds were to his back. The trial court could easily infer that McKnelly was the instigator or that the force he used against Rogers extinguished his self-defense claim.

McKnelly further argues that we should disregard Freeman's testimony based on the "incredible dubiosity rule" because her testimony varied greatly from her deposition and that of other witnesses. Under the incredible dubiosity rule, this Court may impinge upon the responsibility of the fact-finder to judge the credibility of witnesses when confronted with inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony. *Manuel v. State*, 971 N.E.2d 1262, 1271 (Ind. Ct. App. 2012). We may reverse a defendant's conviction where a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence. *Id.* However, application of this rule is rare, and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it. *Id.*

McKnelly's reliance on the incredible dubiosity rule is misplaced because the rule "applies only when a witness contradicts [herself] in a single statement or while testifying, not to conflicts between multiple statements." *Glenn v. State*, 884 N.E.2d 347, 356 (Ind. Ct. App. 2008), *trans. denied*. Indeed, Freeman's testimony may have varied from that of Kalchthaler, McKnelly, and her deposition, but these variations did not render her testimony at trial incredibly dubious. The record reveals that Freeman's testimony at trial provided more details but that her general assertions of what happened that evening were consistent. Furthermore, McKnelly's convictions are not merely supported by Freeman's testimony but by additional circumstantial evidence, such as the

12

Coroner's report.  Therefore, McKnelly's reliance on the incredible dubiosity rule fails, and sufficient evidence supports his convictions.

3. Inappropriate Sentence

Finally, McKnelly claims that his sentence is inappropriate in light of his character and the nature of the offenses.  He suggests that we should revise his sentence to the advisory term for murder, which is fifty-five (55) years, and the advisory term for Class C felony battery, which is four (4) years.  He also suggests that the convictions should run concurrently.

Rule 7(B) of the Indiana Rules of Appellate Procedure gives this Court the power to revise an inappropriate sentence in light of the nature of the offense and character of the offender, giving due consideration to the trial court's decision.  The defendant must persuade us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).  Under Rule 7(B), we seek "to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008).  Whether a sentence is inappropriate ultimately depends upon "the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case." *Id*. at 1224.

In determining whether a sentence is appropriate, we first look to the advisory sentence provided by statute. *Childress*, 848 N.E.2d at 1081.  The sentencing statute for murder provides a sentencing range between forty-five (45) and sixty-five (65) years,

with an advisory sentence of fifty-five (55) years. I.C. § 35-50-2-3. The sentencing range for Class C felony battery is between two (2) and eight (8) years, with an advisory sentence of four (4). I.C. § 35-50-2-6(a).[4]

As to McKnelly's character, his criminal history, including juvenile adjudications, which are not far removed from his adult convictions, is extensive.[5] As a juvenile, McKnelly has adjudications for criminal mischief, possession of paraphernalia, driving under the influence of alcohol in Clay County, Illinois, and child molesting. As an adult, McKnelly has convictions for driving under the influence of alcohol and disorderly conduct in Clay County, Illinois, two convictions for battery, domestic battery, resisting law enforcement, criminal mischief, operating a vehicle while intoxicated, operating a vehicle having never received a license, and sexual battery. As an adult and a juvenile, McKnelly has had his probation revoked, resulting in incarceration at the Department of Correction. Two of his misdemeanor convictions were pending at the time of the present case, and he was charged with and convicted of battery in another cause while in custody awaiting trial.

Regarding the nature of the murder, McKnelly argues that it is not among the "worst of the worst" because of a lack of significant premeditation and that Rogers

---

[4] Effective July 1, 2014, our General Assembly amended and reclassified the offense of battery with a deadly weapon from a Class C felony to a Level 5 felony with a new sentencing range of one (1) to six (6) years, with the advisory sentence now being three (3) years. IND. CODE § 35-50-2-6(b). However, because this offense was committed before the reclassification scheme took effect, we apply the previous sentencing scheme.

[5] Where not specified, the adjudications or convictions took place in Indiana.

14

instigated the fight.[6]  We disagree.  The evidence most favorable to the conviction shows that McKnelly planned to kill Rogers and told Freeman how he was going to do it. Rogers was simply trying to console a supposedly distraught McKnelly.  McKnelly responded by brutally stabbing Rogers multiple times and then beating him with a metal flashlight.  The stab wounds were so numerous that the Coroner had difficulty reporting an accurate count.  Rogers's demise at the hands of McKnelly was especially brutal.

Given McKnelly's criminal history and the nature and circumstances of the murder, McKnelly's sentence is not inappropriate.

Affirmed and remanded.

FRIEDLANDER, J., and MATHIAS, J., concur.

---

[6] Though McKnelly asks us to revise his battery sentence, he makes no specific argument why we should.