## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Apr 09 2015, 9:02 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Marielena Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Cynthia L. Ploughe
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Todd Stewart,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 9, 2015

Court of Appeals Case No.
20A03-1406-CR-200

Appeal from the Elkhart Circuit
Court

The Honorable Terry Shewmaker,
Judge

Cause No. 20C01-1304-MR-000002

**Mathias, Judge.**

[1] Following a jury trial, Todd Stewart ("Stewart") was convicted of murder and sentenced to sixty-five years in the Department of Correction. On appeal, Stewart presents one issue for our review, which we restate as whether the trial

court erred in limiting Stewart's cross-examination of one of the State's witnesses.

[2] We affirm.

## Facts and Procedural History

[3] Mark Miller ("Miller") was the owner of a small tattoo shop in Elkhart, Indiana. Stewart and Matt Howard ("Howard") worked for Miller at his shop, Stewart as a piercer and Howard as a tattoo artist.

[4] On the morning of September 8, 2012, Miller missed a breakfast meeting he had arranged the previous day with his sister, Dawn Miller ("Dawn"). On September 10, after Miller failed to appear at a child custody-related court proceeding, Dawn contacted the police. Later that day, she, Stewart, Miller's wife, Gwen Miller ("Gwen"), and a few other people met at the tattoo shop to search for Miller. The shop was tidy, and no sign of Miller existed. Dawn noticed that Stewart and Gwen failed to help the others search. At some point while the group was at the tattoo shop, Stewart took Dawn aside and showed her a single-page document, which he claimed Miller drafted and signed to give Stewart control of the shop during Miller's "leave of absence." Tr. p. 67. Dawn did not believe that the signature on the document was her brother's signature.

[5] When Dawn left the tattoo shop that night, she parked her car in a parking lot across the street and watched the shop for a time, hoping to see her brother sneak into the shop after everyone left. Instead she saw Stewart and Gwen exit the shop, laughing and playing with a rolling officer chair in the parking lot.

[6] The police soon began their investigation into Miller's disappearance and set up interviews with his friends and family. During their interviews with police, both Stewart and Howard denied any knowledge of Miller's whereabouts. Howard agreed to take a polygraph examination. However, during the examination, Howard admitted to the examiner that he had researched methods to manipulate the polygraph examination results and that he had tested those methods by lying about his last name during the examination.

[7] Nearly two weeks after Miller was last seen alive, his body was discovered inside a steel barrel in the St. Joseph River. He had been shot with a small caliber gun in the head and in his right thigh. A distant cousin of Stewart's contacted the police shortly after Miller's body was discovered and told police that Stewart had asked him about the location of the deepest point in the St. Joseph River. Barry Coy ("Coy"), a friend of Stewart's with whom Stewart shared use of a pickup truck, told police that Stewart had used the truck on the evening of September 7 or the morning of September 8. On the evening of September 7, Coy had noticed an empty steel barrel in the truck bed and a shotgun in the truck cab. The following morning, when Coy arrived at Stewart's house to use the truck again, he noticed that the cab and the bed of the truck were freshly scrubbed and that the exterior of the truck had damage that was not present the night before. A subsequent search by police of Stewart's house revealed guns, ammunition, and several barrels similar to the one in which Miller's body was found.

[8] On April 29, 2013, the State charged Stewart with murder. A jury trial was held from April 28, 2014, to May 1, 2014. At trial, Howard testified that he, Stewart, and Miller were all working at Miller's tattoo shop on the night of September 7, 2012. Howard heard a popping sound then turned to see Stewart standing in the shop's back doorway, holding a pistol with a homemade silencer. Howard also saw Miller lying motionless on the concrete slab just outside the door. Terrified, Howard obliged when Stewart ordered him to help load Miller's body into a barrel, then load the barrel into the back of Stewart's truck.

[9] On cross-examination, Stewart's counsel attempted to impeach Howard by eliciting testimony about his admitted deception during his polygraph examination. The trial court, however, excluded any testimony related to the polygraph examination.

[10] The jury found Stewart to be guilty of murder. On May 29, 2014, the trial court sentenced Stewart to sixty-five years executed in the Department of Correction.

[11] Stewart now appeals.

## Discussion and Decision

[12] Stewart argues that the trial court erred in excluding evidence of Howard's intentional manipulation of the polygraph examination results. Specifically, he argues that, because Howard's testimony against Stewart was so damaging and Howard's credibility so important to the State's case, Stewart was "denied his fundamental right to effectively confront and cross examine Howard." Appellant's Br. at 6.

"[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985). "Furthermore, the right to confront witnesses 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Tague v. Richards,* 3 F.3d 1133, 1137 (7th Cir.1993) (quoting *Chambers v. Mississippi,* 410 U.S. 284, 295 (1973)). The scope and extent of cross-examination is largely within the trial court's discretion. *Pulliam v. State*, 264 Ind. 381, 345 N.E.2d 229 (1976). Only where a total denial of access during cross-examination to an area bearing upon the credibility of a crucial state witness is a Sixth Amendment issue raised. Any lesser curtailment is reviewable only for an abuse of discretion, and we will reverse only when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Brooks v. State*, 259 Ind. 678, 291 N.E.2d 559 (1973).

[13]     Indiana Rule of Evidence 608 provides:

> (a) Opinion and Reputation Evidence of Character.  The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.
>
> (b) Specific Instances of the Conduct of a Witness.  For the purpose of attacking or supporting the witness's credibility, other than conviction of a crime as provided in Rule 609, specific instances may not be inquired into or proven by extrinsic evidence.  They may, however, in the discretion of the court, if probative of truthfulness or

untruthfulness, be inquired into on cross-examination of the witness concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

[14] Stewart's proffered evidence was not in the form of opinion or reputation evidence and was therefore not admissible under Rule 608(a). Instead, Stewart wished to delve into specific instances of Howard's conduct, i.e., his attempt to manipulate the results of his polygraph examination. Rule 608(b) specifically states that specific instances of conduct, like the conduct at issue here, may neither be inquired into nor proven by extrinsic evidence. Rule 609 is not applicable here because the conduct at issue was never the subject of a criminal conviction. The limited exception mentioned in the last sentence of Rule 608(b) is inapplicable because Howard did not testify regarding the truthfulness of another witness. Therefore, the proffered evidence was not admissible to impeach Howard under the Indiana Rules of Evidence.

[15] Stewart, however, claims that he sought to admit the evidence to show the bias or prejudice of Howard, not impeach his character. In *Hatchett v. State,* 503 N.E.2d 398, 403 (Ind. 1987)*,* the defendant offered proof concerning the prior convictions of one witness and proof of the criminal acts of another witness. Our supreme court held that although this proof was inadmissible as impeachment evidence, the defendant did not offer the evidence to impeach the witnesses' character. *Id.* at 404. Instead, Hatchett offered the proof as evidence of the witnesses' bias, i.e., their desire to curry favor with the State, and that their prior criminal activities gave them added incentive to cooperate with the

State. *Id.* The court held, however, that the trial court's exclusion of the proffered evidence was not reversible error because Hatchett had sufficient opportunity to explore the witnesses' biases during cross examination. *Id.* Both of the witnesses admitted that they were testifying as a result of an agreement with the State. *Id.* Under such circumstances, our supreme court held that the trial court's limitation of cross-examination of these witnesses was not an abuse of discretion. *Id.*

[16] We reach the same conclusion here. Even if Stewart's purpose in proffering evidence of Howard's conduct was to show bias rather than to attack his character, the trial court did not abuse its discretion in excluding this evidence. The jury heard evidence that Howard helped Stewart dispose of Miller's body, that Howard owned a small-caliber gun similar to the one used to murder Miller, and that Howard had made contradictory statements to police during their investigation. The jury was therefore well aware of Howard's possible bias, i.e., his interest in pointing the blame for Miller's murder at Stewart instead of himself. Therefore, under these facts and circumstances, Stewart was not denied an opportunity to effectively cross-examine Howard. *See Beaty v. State*, 856 N.E.2d 1264 (Ind. Ct. App. 2006) (even if defendant's purpose in proffering evidence of witness's prior thefts from witness's employer was to show bias rather than generally attack witness's character, trial court did not abuse its discretion in excluding such evidence, in prosecution for theft and receiving stolen property, as jury was well aware of witness's possible bias, i.e., his desire to curry favor with the state, because evidence of witness's plea

agreement with the state was admitted into evidence and explored at some length by both parties, and defendant was able to place before jury some evidence of witness's prior misconduct with respect to his employer which did not involve defendant, such that defendant was sufficiently able to explore witness's bias); *see also Manuel v. State*, 971 N.E.2d 1262 (Ind. Ct. App. 2012) (evidence that victim previously recanted a prior allegation of domestic battery was not admissible to impeach the victim's credibility in prosecution for domestic battery against same alleged perpetrator).

[17] For all of these reasons, we conclude that the trial court did not err in excluding evidence that Howard, one of the State's key witnesses against Stewart, had intentionally attempted to manipulate the results of his polygraph examination during the investigation into Miller's murder.

[18] Affirmed.

Najam, J., and Bradford, J., concur.