**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MATTHEW J. MCGOVERN**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ANTHONY D. GOFFINET | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 82A01-1401-CR-031 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT 2
The Honorable Richard D'Amour, Judge
Cause No. 82D02-1206-MR-621

**December 1, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Anthony Goffinet appeals his conviction and sentence for Murder.[1] The trial court sentenced him to sixty-five years for murder and enhanced the sentence twice, thirty years for being a habitual offender[2] and twenty years because the murder caused the termination of a human pregnancy.[3] Goffinet presents the following restated issues for review:

1. Was Goffinet's cross-examination of a witness improperly limited?

2. Did admission of evidence regarding Goffinet's character amount to fundamental error?

3. Did the trial court err in allowing an amendment to the charging information filed after the omnibus date?

4. May a sentence be enhanced both for being a habitual offender and for the termination of a human pregnancy?

We affirm.

In June 2012, Goffinet had been evicted from his home and was living in a motel with his three-year-old daughter, A.G. His pregnant wife, Kathleen, had left him at the beginning of the month, and he was "extremely concerned" about whether she was seeing someone else. *Transcript* at 515. Goffinet desperately wanted to reconcile with Kathleen, and he was considering moving the family out of town to live with a friend. He told another friend, however, that if he found out Kathleen was with another man, he would kill them both and save a bullet for himself. In an attempt to reach Kathleen, he called her place of work multiple times a day during the first week of June.

---

[1] Ind. Code Ann. § 35-42-1-1 (West, Westlaw current with all 2014 Public Laws of the 2014 2nd Regular Session & 2nd Regular Technical Session of the 118th General Assembly).

[2] Ind. Code Ann. § 35-50-2-8 (West, Westlaw 2012) (former version applicable in this case).

[3] I.C. § 35-50-2-16 (West, Westlaw current with all 2014 Public Laws of the 2014 2nd Regular Session & 2nd Regular Technical Session of the 118th General Assembly). An enhancement imposed under this statute shall be between six and twenty years and runs consecutively to the underlying sentence.

On Wednesday, June 6, his first and only day of work at Dish Express, Goffinet was emotional and very agitated and acted erratically throughout the day. He told Randy Morelos, a coworker and former acquaintance, about his marital issues and threatened multiple times, "I'm gonna kill the fucking bitch." *Id.* at 883. After lunch, Goffinet returned with a stuffed animal that he said was Kathleen's and attempted to rip its head off while telling Morelos, "this is exactly what I'm gonna do to her." *Id*. at 888. Goffinet's supervisor observed his "uncontrollable" behavior throughout the workday and heard him say, "I'm gonna get her." *Id.* at 680, 681. Goffinet called his supervisor the following day and indicated he would not be back to work until Monday.

On the evening of June 8 and then again the next morning, Goffinet called Kathleen's aunt to inquire about his wife's whereabouts. During the second call, he asked her to inform Kathleen that he might be moving to Indianapolis. He then called his friend, Cheryl Moser, and asked for a ride to see his ten-year-old son, whom he had not seen for several years. Goffinet was told to leave upon arriving at his son's home and an argument ensued between the adults.

That afternoon and evening, Goffinet called the Lone Star restaurant approximately ten times while Kathleen was working. Each time that he was told she was unavailable, Goffinet became more agitated, angry, and aggressive. He demanded to speak with her and even began telling the bartender the details of their relationship. The bartender eventually asked the general manager to get involved. The last call came around 8:00, with Goffinet threatening the manager, "let me speak to my wife or I'll come up there and twist somebody's head off." *Id*. at 560. The manager considered calling the police but did not.

Around that time, Goffinet called Moser to ask for another ride. This time he wanted to be driven to Kathleen's work. He told Moser that A.G. missed Kathleen and that he wanted to try to convince her to come back to them. Moser drove to the motel and picked up Goffinet and A.G. After securing A.G. in her child seat, Goffinet went back to his room and, according to a motel employee, came out with a knife. He then got in the car.

Moser parked outside the restaurant and they waited for about twenty minutes in the car. In the meantime, Kathleen asked a coworker for a ride home. The coworker expressed interest in watching the end of a game, so Kathleen said she was going across the street to Taco Bell while she waited. She exited through the back of the restaurant, where other employees were taking a break.

Goffinet saw Kathleen and asked Moser to pull around back. He exited the car as it pulled near her, and Kathleen asked what he was doing there, indicated she did not want to speak with him, and told him not to touch her. When Goffinet stated that A.G. was in the car, Kathleen turned her attention to the child. She spoke with her daughter and then indicated that she would like to take her for a taco. She asked if Moser would drive over to Taco Bell to pick up A.G., and Moser agreed. Kathleen carried A.G. across the street, and Goffinet followed, all the while pleading with her to come back to him.

After getting food and while out of sight of the surveillance camera, Goffinet said something to Kathleen and she responded that he had ruined her life and that she would not go with him. When Kathleen attempted to leave, he prevented her from doing so and told her not to go out the door. She can then be heard saying, "what are you doing?" *Exhibits* at 126. Shortly thereafter, Kathleen screamed upon being stabbed in the chest.

4

She then moved back in view of the camera and away from Goffinet, holding her chest. Goffinet pursued her as she backed away, eventually falling to the ground as he pulled on her. He demanded that she get their daughter and get in the car. Kathleen picked up A.G. and walked toward the other door, but Goffinet confronted her again. Most of the discussion cannot be heard, but as Goffinet spoke to her in an aggressive manner, Kathleen pleaded, "quit fucking with me." *Id.* He told her to "just get in the car." *Id.* Upon exiting, Kathleen handed A.G. over to Goffinet and then ran across the street screaming for help and stating that she had been stabbed.

As Kathleen's coworkers attended to her injury on the ground behind Lone Star, Goffinet entered Moser's car and passed A.G. in an unusual manner back to her child seat. He told Moser to go ahead and drive. As they drove away, a citizen followed them and called 911. Police eventually pulled over Moser and Goffinet. Kathleen's blood was found in the car, on A.G.'s clothing, and in the Taco Bell.

Kathleen died at the hospital as a result of the single stab wound to her chest. This deep wound, which was inflicted with great force, went through her chest and into her heart, resulting in massive internal bleeding. An expert testified that the knife, which was never located, had a smooth edge. Accordingly, the wound was not caused by a steak knife from the Lone Star restaurant, which used serrated steak knives.

Following a four-day jury trial, Goffinet was convicted of murder.[4] The jury also found that he was a habitual offender and had terminated a human pregnancy when he

---

[4] The jury found Goffinet not guilty of intimidation.

5

murdered Kathleen.  On December 23, 2013, the trial court sentenced Goffinet to 65 years for murder, enhanced by 30 years for being a habitual offender and 20 years for terminating a human pregnancy.  This resulted in an aggregate term of 115 years in prison.  Goffinet now appeals.  Additional facts will be provided below as needed.

1.

Goffinet argues that his cross-examination of Kathleen's coworker, Christopher Metz, was improperly limited.  Goffinet sought to elicit testimony that Kathleen had expressed to Metz a general desire to obtain custody of A.G.  He claims, on appeal, that this evidence was "vital to the defense's theory that Kathleen was the initial aggressor and that she was stabbed accidentally in the ensuing struggle." *Appellant's Brief* at 10.

The scope and extent of cross-examination is within the sound discretion of the trial court, and we will reverse only upon a finding of an abuse of discretion. *Manuel v. State*, 971 N.E.2d 1262 (Ind. Ct. App. 2012).  An abuse of discretion occurs where a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.*  A defendant's right to present a defense is of the utmost importance, but it is not absolute. *Id.*  Like the State, the defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* at 1266.  *See also Kubsch v. State*, 784 N.E.2d 905, 926 (Ind. 2003)("[r]egardless of Kubsch's theory of defense, evidence to support the theory must comply with applicable evidentiary rules").

Further, a trial court's exclusion of evidence is subject to a harmless error analysis. *See* Ind. Trial Rule 61.  Error is harmless if its probable impact on the jury, in light of all

6

the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. *Gault v. State*, 878 N.E.2d 1260 (Ind. 2008).

Goffinet argued below that the challenged testimony was admissible under Indiana Evidence Rule 803(3) as a statement of Kathleen's then-existing state of mind – that is, an intent/motive to gain custody of her daughter. In support, Goffinet made the following offer to prove by questioning Metz outside the presence of the jury:

Q.   Had [Kathleen] expressed her intent to try to custody [sic] of [A.G.]?
A.   When you say intent to me that implies that she had a plan of action or was going to take appropriate steps so I would say more of a desire.
Q.   Okay her motive?
A.   Her desire.

*Transcript* at 633.

Providing no significant Evid. R. 803(3) analysis on appeal, Goffinet turns his argument to constitutional claims that were not raised below. He contends he was denied his constitutional right to present a complete defense and right of confrontation. It is well established, however, that an appellant may not argue one ground below and then raise new grounds on appeal. *See Konopasek v. State*, 946 N.E.2d 23 (Ind. 2014). Recognizing the potential for waiver, Goffinet argues that the limitation on his cross-examination of Metz constituted fundamental error.

"Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to 'make a fair trial impossible.'" *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014) (quoting *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002)). "[F]undamental error is a daunting standard that applies 'only in egregious

7

circumstances.'" *Knapp v. State*, 9 N.E.3d 1274, 1281 (Ind. 2014) (quoting *Brown v. State*, 799 N.E.2d 1064, 1068 (Ind. 2003)).

In this case, any arguable error would be harmless, and certainly not fundamental. Goffinet urges that evidence of Kathleen's desire to gain custody of A.G. "was the only evidence to support the defense's version of the events." *Appellant's Brief* at 13. In point of fact, however, there was absolutely no evidence (including the excluded evidence at issue) to support the defense claim that Kathleen brought a knife to Taco Bell and initiated the confrontation with Goffinet in order to take A.G. from him. *Cf. Hyser v. State*, 996 N.E.2d 443, 449 (Ind. Ct. App. 2013) (reversal warranted where defendant was precluded from presenting evidence that was "exculpatory, unique, and critical to his defense" and where his defense "was not implausible"). The facts overwhelmingly establish that Goffinet was the unwanted pursuer and aggressor on the night in question after unexpectedly arriving at Kathleen's place of employment with A.G. Under the facts of this case, we can say with confidence that admission of evidence of Kathleen's general desire to gain custody of her daughter would have had no effect on the jury's verdict.

2.

Goffinet claims the trial court committed fundamental error when it permitted the State to attack his character. Specifically, during redirect examination of one of Goffinet's friends, the State elicited the following testimony to which Goffinet objects:

> Q.    Okay can you tell us what you know about his personality?
> A.    In my dealings with him he seemed to be the type of person that would hold a grudge but even above and beyond holding a grudge…….in that regard I think he would…….he just wasn't really able to let things go, like minor slights that somebody would have he couldn't let go.

8

If he felt that he was slided [sic] or insulted in any way, you know…….

[Defense objection based on relevancy overruled.]

Q. Okay. In that statement that [defense counsel] showed you you said that Mr. Goffinet was paranoid and had a one-track mind?
A. At times, yea especially there towards the end.
Q. Okay. Specifically what was he paranoid about?
A. It really just depended on the situation I mean it could be…….towards the end it was about in regards with Katie whether or not she was seeing someone else but I mean it could've been any…….anything from people were, you know, were out to get him or…….or, you know, people were conspiring against him for whatever certain terms of if you would stop to do a favors [sic], you know, if you wouldn't do a favor for him or something that he asked then obviously you were on the other side of that (inaudible) coin where, you know, you weren't a friend you were just out to get him type of thing.

*Transcript* at 521-22.

On appeal, Goffinet argues that this evidence should have been excluded under Indiana Evidence Rules 403 and 404(b) because it was unfairly prejudicial and constituted impermissible character evidence. The jury was charged with determining whether the stabbing was accidental. He claims, therefore, that admission of "mere character propensity evidence" that he had a "short fuse and held a grudge" presented a real danger that the jury would convict merely on the belief that he acted in conformity with his character. *Appellant's Brief* at 21.

Even assuming that the evidence was erroneously admitted, the error was harmless. Other evidence admitted at trial much more vividly established these undesirable character traits. In addition to the excessive and aggressive calls Goffinet made to Lone Star in the days leading up to the stabbing, he verbalized serious threats to a number of people and

9

acted erratically during an entire day of work at a new job only days before the stabbing. In fact, at work, Goffinet threatened a number of times that he was going to kill his pregnant, estranged wife, and he even demonstrated to a coworker how he would twist her head off. In light of this and other evidence, the probable impact of the challenged testimony regarding Goffinet's general character of being short-fused, paranoid, and grudge-holding was sufficiently minor so as not to have affected his substantial rights. *See Hall v. State*, 15 N.E.3d 1107.

3.

Three months prior to trial, on August 12, 2013, the State filed a sentencing enhancement to the murder charge for the termination of a human pregnancy. At a hearing on October 10, 2013, Goffinet objected to the amendment because it was filed after the omnibus date. He then asked the court to take its ruling under advisement "in case we wanted to submit any further argument." *Transcript* at 26. The matter was taken under advisement, and Goffinet did not seek a continuance. After the first phase of the trial, Goffinet once again objected to the amendment as untimely, which was overruled by the trial court. Once again, Goffinet did not ask for a continuance. *See Shelton v. State*, 490 N.E.2d 738 (Ind. 1986) (a defendant can move for a continuance of the second phase of a bifurcated trial).

A defendant's failure to request a continuance after the trial court permits a pre-trial substantive amendment to the charging information over the defendant's objection results in waiver. *Wilson v. State*, 931 N.E.2d 914 (Ind. Ct. App. 2010), *trans. denied*. Goffinet

10

failed to avail himself of the opportunity for a continuance and, thus, has waived the issue for appellate review.

Wavier notwithstanding, we conclude that the amendment did not affect Goffinet's substantial rights. Ind. Code Ann. § 35-34-1-5 (West, Westlaw current with all 2014 Public Laws of the 2014 2nd Regular Session & 2nd Regular Technical Session of the 118th General Assembly) permits amendments in matters of substance made before trial "if the amendment does not prejudice the substantial rights of the defendant." The "substantial rights" of a defendant include a right to sufficient notice and an opportunity to be heard regarding the charge. *Gaby v. State,* 949 N.E.2d 870 (Ind. Ct. App. 2011). "Ultimately, the question is whether the defendant had a reasonable opportunity to prepare for and defend against the charges." *Id.* at 874 *(quoting Brown v. State,* 912 N.E.2d 881, 890 (Ind. Ct. App. 2009), *trans. denied* ). The substantial rights of the defendant are not prejudiced if: (1) a defense under the original information would be equally available after the amendment, and (2) the defendant's evidence would apply equally to the information in either form. *Gaby v. State,* 949 N.E.2d 870.

Goffinet received notice of the amendment three months prior to trial. Although the trial court did not rule on his objection until after phase one of the trial, this was due to Goffinet's request to hold the ruling under advisement. This delay, which was invited by Goffinet, had no effect on his ability to prepare for trial. To be sure, his defense that the stabbing was accidental was equally available after the amendment and his evidence applied equally. We find his claim that "the amendment changed the entire theory of the State's case" disingenuous, as the underlying murder charge remained unaffected and the

11

amendment simply added a sentencing enhancement. *Appellant's Brief* at 29. Goffinet

has wholly failed to establish error with respect to the amendment.

4.

Finally, Goffinet challenges his 115-year sentence.[5] He argues that the trial court

did not have authority to run the enhancements consecutively to one another and, thus,

contends that his aggregate sentence should be only 95 years.

The principal cases cited by Goffinet, *Starks v. State*, 523 N.E.2d 735 (Ind. 1988)

and *Venters v. State*, 8 N.E.3d 708 (Ind. Ct. App. 2014), address the tacking of habitual

offender enhancements. In that context, our Supreme Court has held that absent express

statutory authorization, tacking of habitual offender sentences is improper. The Court

explained the unique nature of habitual offender enhancements and the need for such a rule

as follows:

> The sentence enhanced under the habitual offender statute is a special
> statutory one. It can have the dramatic effect of increasing a single sentence
> from two years to half a lifetime. A basis for such a gross impact is the
> existence of the two prior unrelated felony convictions and sentences, and
> the dangerous nature of the offender which they bespeak. A basis for the
> gross impact which consecutive sentences may have is, by contrast, the moral
> principle that each separate and distinct criminal act deserves a separately
> experienced punishment. Furthermore the habitual offender status
> determination carries a more binding effect upon the sentence that does the
> determination of multiple criminal acts. Therefore, the purpose and process
> of the felony habitual offender statute has special and distinct dimensions.
>     In sum, it is apparent, from a study of the present statutes, that such
> statutes are silent on the question of whether courts have the authority to
> require habitual offender sentences to run consecutively, when engaged in
> the process of meting out several sentences. In the absence of express
> statutory authorization for such a tacking of habitual offender sentences,
> there is none.

---

[5]  As set forth above, Goffinet was sentenced to 65 years for murder enhanced by 30 years under the general
habitual offender statute and then an additional 20 years for causing the termination of a human pregnancy.

*Starks v. State*, 523 N.E.2d at 737. This rule has since been extended to cases where the habitual offender enhancements arise out of separate and unrelated trials or sentencing hearings and to cases involving different habitual offender and/or progressive penalty regimes. *See Venters v. State*, 8 N.E.3d 708.

*Starks* and *Venters* are inapposite to the instant case, which does not involve the tacking of multiple habitual offender enhancements. Rather, here we have a single habitual offender enhancement and another type of enhancement based on the specific facts of the crime and unrelated to Goffinet's recidivist status.[6] The enhancements vindicate separate policy considerations, and the concerns expressed by the Court in *Starks* are simply not present here.

Goffinet has not directed us to any authority prohibiting consecutive enhancements when one enhancement is fact-based and the other is status-based, and we are aware of none.[7] Accordingly, we affirm Goffinet's 115-year aggregate sentence for murder.

Judgment affirmed.

VAIDIK, C.J., and MAY, J., concur.

---

[6] We agree with the State that this situation if more akin to cases where an underlying felony is elevated to a higher class of crime based on factual circumstances of the crime (such as, the age of the victim, the degree of injury, or being armed with a deadly weapon), and no prohibition against appending a habitual offender enhancement to the sentence for the underlying elevated crime has ever existed.

[7] In his reply brief, Goffinet raises a new argument for reversal: "the language of both enhancement statutes indicates that the enhancements must be attached to the sentence for the underlying felony, not to one another." *Appellant's Reply Brief* at 9. This argument, which at first blush we find unpersuasive, is waived because it was not framed in Goffinet's principal brief. *See French v. State*, 778 N.E.2d 816 (Ind. 2002).